Jose RIVERA, Plaintiff-Appellant,

v.

Richard SCHWEIKER, Secretary of the United States Department of Health and Human Services, Defendant-Appellee.

No. 1141, Docket 83–6017.

United States Court of Appeals, Second Circuit.

Argued April 20, 1983.

Decided Sept. 7, 1983.

Richard Rivera, New York City (of counsel to Michael D. Hampden, New York City, Bronx Legal Services, New York City), for plaintiff-appellant.

R. Nicholas Gimbel, Asst. U.S. Atty. S.D. N.Y., New York City (John S. Martin, Jr., U.S. Atty., S.D.N.Y.), Peter C. Salerno, Asst. U.S. Atty., New York City, of counsel), for defendant-appellee.

Before LUMBARD, OAKES and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

Plaintiff appeals from an order of the United States District Court for the Southern District of New York, Robert W. Sweet, *Judge,* entered November 23, 1982, denying plaintiff's Fed.R.Civ.P. 12(c) motion for judgment on the pleadings and dismissing the complaint.

## BACKGROUND

Plaintiff Rivera is a 56-year-old male who lives with his wife in an apartment in Bronx, New York. He possesses an eighth grade education, which he received in Puerto Rico. He is able to read and write Spanish and to speak and understand English to a limited extent.

Upon leaving school, Rivera worked on a farm planting fruits, and in 1947 came to New York. He first worked as a dishwasher and then, in September 1948, he began to work for Progress Frocks, Inc., which operated a dress factory in the garment industry in New York City. From that date until December 1977—except for the period from March 1951 to March 1953 when he served as an enlisted man in the United States Army, including service in Korea— Rivera generally worked six days weekly between 8:00 a.m. and 6:00 p.m. His duties consisted principally of packing and receiving merchandise, preparing dresses and suits for sewing machine operators, and delivering finished merchandise to shipment stations. This was generally heavy work; he often moved rolls of fabric which weighed over 100 pounds and pushed racks containing up to 300 suits through the city streets to destinations up to ten blocks from his place of employment.

In December 1977, Progress Frocks, Inc. closed, and Rivera obtained similar employment and worked similar long hours at a garment factory operated by Bill Levkoff, Inc.

On May 16, 1980, after 32 years in the garment industry and two and one half years at Levkoff's, Rivera awoke to prepare to go to work but suffered what was later diagnosed as a stroke. Although he managed to work that day, he has not since worked. On that date he went to see Dr. Rafael Beltran, an ophthalmologist, because he could not see from his left eye. Dr. Beltran determined that Rivera's loss of sight was not directly related to his eyes and advised him to go to a hospital. Rivera went to Albert Einstein Hospital where he remained an in-patient from May 27, 1980 until June 3, 1980.

Dr. Jay M. Coblentz, a neurologist at the hospital, determined that Rivera had suffered a "cerebral infarction, right occipital lobe, with left inferior quadrant field cut." In the hospital's discharge summary, Dr. Coblentz concluded that Rivera's nervous system was in an unstable state. Consequently, he ordered an echocardiagram. The echocardiagram, performed by Dr. S. Fein and Dr. J. Strom on June 2, 1980, revealed that Rivera's aortic valve had less than one half the normal adult valve opening, that his interventricular septum and left ventricular posterior wall were much thicker than normal, and that the volume of blood that Rivera's heart pumped into his system every minute was lower than normal. The doctors concluded their report by noting that Rivera's aortic valve had thickened and hardened by reason of calcium deposits and that the walls of his heart were thickening, thus causing an apparent diminution in its capacity.

By letter dated August 8, 1980, Dr. Coblentz concluded that Rivera's significant loss of vision in his left visual field was "with reasonable medical certainty . . . permanent." He also wrote that Rivera had been seen in the office for further stroke prevention and that "[a]t this time, it is appropriate to state that this patient is unable to work at his job or any other job and he is permanently disabled." Also by letter dated February 24, 1981, Dr. Coblentz wrote that Rivera "continues to experience symptoms of ongoing, recurrent cerebrovascular insufficiency." He concluded that "there is no question in my mind that the instability of the patient's cerebrovascular system is such that if he were to return to work he would suffer a disabling stroke and/or succumb."

Rivera received out-patient treatment from the Veterans Administration Hospital from December 11, 1980 until February 23, 1981. A letter written by Dr. Messenger of the Veteran's Administration Hospital, who treated Rivera several times, stated that because of Rivera's loss of vision in his left visual field, it would be "impossible" for him to work.

On August 23, 1980 Rivera filed an application with the Secretary of Health and Human Services seeking social security disability benefits based on his inability to work because of the effects of the May 16, 1980 stroke. The application was denied by the Secretary initially and also upon reconsideration. Rivera filed an application for Supplemental Security Income (SSI) benefits on November 26, 1980. The application was also denied initially and upon reconsideration. Rivera requested and received a hearing before an Administrative Law Judge (ALJ) of the Social Security Administration's Office of Hearings and Appeals.

At the hearing, held on March 4, 1981, it was revealed that, before his stroke, Rivera was an active person who hardly ever missed a day of work, led an active social life, and was active in the affairs of his church. After his stroke, Rivera testified, he was afflicted by persistent headaches, dizziness and neck pains. He testified that he suffered from headaches which lasted twenty minutes to one hour and which occurred six to seven times each day. Following his stroke, according to Rivera and other witnesses, he was unable to return to work, found his social activities limited, and experienced considerable restrictions of his participation in church-related activities. Rivera's health continued to be so poor that on several occasions his friends had to assist him home before the church's services had ended.

During the hearing, the ALJ received reports from other physicians, in addition to those submitted from Dr. Coblentz and Dr. Messenger. Dr. Leon Weiss, an ophthalmologist, who had earlier examined Rivera's eyes on October 1, 1980, reported that Rivera "has no vision to the left side when looking ahead and has occasional dizziness and headaches." He also diagnosed that Rivera had had a "cerebrovascular accident" involving the "right parietal region of the brain with involvement of the right optic nerve tract."

Dr. Morton Finkel, a neurologist, who had examined Rivera on October 3, 1980, reported that Rivera suffered a "right cerebral infarction, occipital area, with residual dense left hemonymous hemianopsia. It is expected that the patient's hemianopsia is going to be permanent."

Near the conclusion of the hearing, the ALJ ordered that Rivera be examined by a neurologist. Dr. Sidney Elpern, a neurologist, conducted a consultative examination of Rivera on March 26, 1981. He confirmed that Rivera continued to have a "permanent left hemianopsia" and headaches since the May, 1980 stroke. Dr. Elpern noted that Rivera complained of poor sleep and shortness of breath after walking only two or three blocks. He also reported that Rivera "gives symptoms suggestive of shortness of breath or activity suggesting impaired cardiac function."

On June 19, 1981, the ALJ issued an opinion regarding Rivera's claim for disability insurance benefits and supplemental security income. He determined that Rivera was not entitled to disability insurance benefits or supplemental security income. This determination was based on the ALJ's findings that Rivera's allegations of pain were not credible, that Rivera's impairments (cerebral infarction, right occipital lobe, and left hemianopsia) were not such as to prevent him from performing his past duties as a shipping clerk (i.e., pushing racks of clothes, packing, heavy lifting, constant standing), and that Rivera was not under a disability as defined in the Social Security Act.

After the decision, Rivera requested a review before the Appeals Council of the Office of Hearings and Appeals. By letter dated August 11, 1982, the Appeals Council notified Rivera that there was no basis for granting his request for a review and that the hearing decision would stand as the final decision of the Secretary.

On October 9, 1982, Rivera commenced this action seeking review of the Secretary's decision. Thereafter, Rivera moved pursuant to Fed.R.Civ.P. 12(c) for judgment on the pleadings. Judge Sweet denied the motion and dismissed the complaint by order

entered November 23, 1982.[1] This appeal followed.

## DISCUSSION

We are asked to determine whether the Secretary's decision that Rivera could engage in his prior employment and is not disabled is supported by substantial evidence on the record as a whole. We find that the Secretary's decision is not supported by substantial evidence. Therefore, we reverse and remand for proceedings consistent with this opinion.

An individual applying for social security disability benefits is considered to have a disability if he has an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A) (Supp. V 1981); 42 U.S.C. § 1382c(a)(3)(A) (1976). Further,

an individual ... shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A) (1976).

■ To qualify for disability benefits under the Social Security Act, the claimant must be unable to perform his previous work or any other kind of substantial work. *Dousewicz v. Harris,* 646 F.2d 771, 772 (2d Cir.1983). The claimant need not demonstrate that he is completely helpless or totally disabled. *Gold v. Secretary of Health, Education and Welfare,* 463 F.2d 38, 41 n. 6 (2d Cir.1973).

A five-step sequence, promulgated in 20 C.F.R. §§ 404.1520, 416.920 (1981), is utilized by the Secretary in evaluating disability claims.

First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982). The burden of proving disability, encompassing the first four of these steps, is on the claimant. *Id.* The burden of

---

1. A motion for judgment on the pleadings under Fed.R.Civ.P. 12(c) "is designed to provide a means of disposing of cases when the material facts are not in dispute." 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1367 (1969). A Rule 12(c) motion will not be granted "unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Id.* § 1368. The opinion of the district court denying Rivera's Rule 12(c) motion clearly stated that the district court based its action on a finding that the ALJ's decision was supported by substantial evidence; it therefore constituted an unequivocal ruling that Rivera was not entitled to judgment as a matter of law. The dismissal which followed the denial thus effected a final judgment on the merits which was appealable.

proving the fifth step is on the Secretary. *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980).

Objective and subjective factors are to be considered by the Secretary when evaluating a conclusion of disability. These factors include: (1) objective medical facts; (2) diagnoses or medical opinions based on these facts; (3) subjective evidence of pain and disability testified to by the claimant and family or others; and (4) the claimant's educational background, age, and work experience. *Id.; Gold,* 463 F.2d at 41 n. 2.

Upon review by this court of a final decision by the Secretary, pursuant to 42 U.S.C. § 405(g) (Supp. V 1981), the court will look to the above four areas to determine if there is substantial evidence to support the Secretary's decision. *Bastien v. Califano,* 572 F.2d 908, 912 (2d Cir.1978). The factual findings of the Secretary, if supported by substantial evidence on the record as a whole, shall be conclusive. *Id.; see also Beane v. Richardson,* 457 F.2d 758, 759 (9th Cir.), *cert. denied,* 409 U.S. 859, 93 S.Ct. 144, 34 L.Ed.2d 105 (1972). Although the standard of review generally implies a deference to the expertise of the agency, the "courts retain a responsibility . . . to reverse and remand if the Secretary's decision is not supported by substantial evidence." *Smith v. Califano,* 637 F.2d 968, 970 (3d Cir.1981). Of course, a reviewing court should remember that "[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion." *Marcus v. Califano,* 615 F.2d 23, 29 (2d Cir.1979); *see also Gold,* 463 F.2d at 41 (Social Security Act should be broadly construed).

Initially, Rivera contends that the ALJ ignored or failed to consider properly the evidence of cerebrovascular and cardiovascular diseases which, he asserts, caused the infarction and are the source of his continuing disability. In response, the Secretary claims that the ALJ recognized an inconsistency in the clinical evidence regarding the severity of Rivera's cerebral infarction of the right occipital lobe and his left hemianopsia, resolved the inconsistency, and determined that Rivera was not disabled under the Act. For the reasons discussed below, we agree with Rivera.

A review of the five medical reports in this case demonstrates that all agreed that Rivera suffered a markedly diminished loss of vision. Further, of the three reports which considered the subject of the cause of the loss of vision, the reports of Dr. Coblentz, Dr. Weiss, and Dr. Elpern all agreed that Rivera's diminished vision was triggered by the stroke of May 16, 1980. Additionally, Dr. Coblentz's and Dr. Elpern's reports are consistent in noting that Rivera's cerebrovascular system has problems involving various arteries and his heart. Lastly, Dr. Coblentz's report, the only one which addressed the reason for the stroke, confirmed that Rivera's cerebrovascular insufficiency was the cause of the stroke.

Based on the foregoing, it appears that Rivera is correct in his initial contention. Although the ALJ apparently considered all the evidence, he did not evaluate it correctly. There is no merit to the Secretary's claim that the ALJ recognized an inconsistency in the clinical reports and resolved that inconsistency. We perceive no inconsistency in the two areas—the loss of eyesight and the present instability of Rivera's cerebrovascular system—which are pivotally relevant to the question of whether Rivera has a disability. As Rivera points out in his brief, the ALJ's opinion does not even discuss the problems of Rivera's cerebrovascular system. Therefore, it is not surprising that the ALJ determined that Rivera could return to his prior employment as a shipping clerk. This determination is in fact rebutted by substantial evidence in the record to the contrary. Dr. Coblentz, Rivera's treating physician, made it clear in his report that if Rivera were "to return to work he would soon suffer a disabling stroke and/or succumb." The expert opinion of a treating physician on the subject of disability is binding on the Secretary unless substantial evidence is presented to the contrary. *Eiden v. Secretary of Health, Education and Welfare,* 616 F.2d 63, 64 (2d Cir.1980); *McLaughlin v. Secretary of*

*Health, Education and Welfare of the United States,* 612 F.2d 701, 705 (2d Cir.1980). In this case there is no substantial contradictory evidence that Rivera does not have a cerebrovascular problem which would cause yet another stroke if he returned to his prior employment.[2]

Rivera also contends that the ALJ erred in determining that Rivera's allegations of disabling neck pains and headaches were not credible. We agree. The ALJ expressed the view that Rivera's allegations of pain were not credible because Rivera, during the hour-long hearing, displayed no signs of extreme pain or discomfort and because Rivera supposedly admitted during the hearing that if advised by his doctor of the safety of returning to his prior employment, he could perform his prior job with difficulty due to his visual impairment, but not necessarily due to the pain.[3]

First, although it is clearly permissible for an administrative law judge to evaluate the credibility of an individual's allegations of pain, this independent judgment should be arrived at in light of *all* the evidence regarding the extent of the pain. *See McLaughlin,* 612 F.2d at 705. It is clear to us that the ALJ herein did not follow this standard. In assessing Rivera's allegations of pain, the ALJ placed principal, if not sole, reliance upon his observations at the hearing. The ALJ's observations, under these circumstances, are entitled to limited weight. *See Carroll v. Secretary of Health and Human Services,* 705 F.2d 638, 643 (2d Cir.1983) (ALJ's observation, that claimant sat through hearing without apparent pain, is that of a lay person). Further, there is overwhelming, substantial evidence which rebuts the ALJ's medical conclusion. There is testimony by Rivera's wife and a neighbor that Rivera often complained of headaches and neck pains; and both testified that they had seen Rivera faint in church following his stroke. Furthermore, the testimony of the witnesses and Rivera is supported by the medical reports of Dr. Coblentz, Dr. Weiss, and Dr. Elpern. All report that Rivera had complained that he suffered from headaches and dizziness since the May 1980 stroke. The conclusion of the ALJ, based on his one-hour observation, is additionally weakened by Rivera's testimony concerning the headaches. Rivera's testimony that he suffered headaches intermittently, lasting 20 to 60 minutes, six or seven times each day, did not render it improbable that he could sit through a one-hour hearing before the ALJ, and not suffer demonstrably from such a headache.

One last point about the pain credibility issue needs to be emphasized. Pain itself may be so great as to merit a conclusion of disability where a medically ascertained impairment is found, even if the pain is not corroborated by objective medical findings. *Gallagher v. Schweiker,* 697 F.2d 82, 84 (2d Cir.1983). It is apparent that the ALJ did not view the allegations of pain in all relevant contexts. In our view, the allegations of pain required three separate analyses. First, the allegations of pain should have been evaluated as the sole basis for establishing disability, as there existed medically ascertained impairments as required by *Gallagher.* Second, the allegations of pain should have been evaluated as a factor in the overall determination of whether Riv-

2. Not only did Dr. Coblentz determine that Rivera's cerebrovascular instability made returning to his prior employment a life or death proposition, but Dr. Messenger concluded that Rivera's visual problems made it "impossible" for him to return to work.

3. The ALJ wrote:
   Both his [Rivera's] neck pains and headaches are intermittent, and although he says they are severe, he still has the wherewithal to attend hour long churches [sic] service on a daily basis. He admitted he could feed and dress himself, and after an hour long hearing, he took only one pill and did not display any outward signs of extreme pain or discomfort. His answer to questioning at [sic] hearing were prompt and responsive and not at all indicative of one in constant and harrowing pain. He conceded that his reluctance to work is based on his doctor's advise, and that if advised to, he could do so with difficulty due to his visual impairment, but not necessarily due to the pain. Thus, it is found he suffers no severe or disabling pain.
   *See infra* note 4 for Rivera's testimony on why he was reluctant to return to work.

era was disabled because of his loss of vision. Third, the allegations of pain should have been evaluated as a factor in the overall determination of whether Rivera was disabled because of his cerebrovascular problems. The ALJ did evaluate the allegations of pain *alone* to determine if they could serve as the sole basis for a conclusion of disability under the Act. Further, the ALJ evaluated the allegations of pain as a factor in the overall determination of whether Rivera was disabled because of his loss of vision. However, the record does not indicate that pain, in the context of Rivera's cerebrovascular difficulties, was properly weighed. In view of the rule that a claimant's subjective evidence of pain, when accompanied by objective medical evidence, as exists here, is entitled to great weight, *see, e.g., Dobrowolsky v. Califano,* 606 F.2d 403, 409 (3d Cir.1979), we determine that the record supports Rivera. In any event, even had he addressed the issue of pain in the context of Rivera's cerebrovascular difficulties, the substantial evidence on the record as a whole would not have supported a finding by the ALJ that Rivera's allegations of pain were not credible in the context of Rivera's cerebrovascular problems.

Also, the ALJ's reliance on Rivera's testimony regarding his desire to work is misplaced. First, a review of the transcript of the hearing reveals no such admission by Rivera that he could work despite the headaches and neck pains.[4] Second, any evidence of a desire by Rivera to work would merely emphasize the positive value of his 32-year employment history. A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability. *Singletary v. Secretary of Health, Education and Welfare,* 623 F.2d 217, 219 (2d Cir.1980).

■ Therefore, we hold that the Secretary's decision that Rivera could return to his prior employment and is not disabled must be reversed as it is not supported by substantial evidence on the record as a whole. Consistent with the areas designated for appropriate review in this court, *see, e.g., Bastien,* 572 F.2d at 912, we determine that the objective medical facts, the diagnoses and expert opinions of the treating and examining physicians, the subjective evidence of pain as testified to by Rivera and corroborated by his wife and friend, and Rivera's long work record support the conclusion that Rivera is unable to return to his prior physically demanding work as a shipping clerk.

We direct that this matter be remanded to the Secretary. As correctly noted in the Secretary's brief, there remains for consideration by the Secretary the question whether Rivera could engage in gainful activity less strenuous than his prior employment as a shipping clerk. *See Campbell v. Secretary of Health and Human Services,* 665 F.2d 48 (2d Cir.1981), *reversed on other grounds sub nom. Heckler v. Campbell,* —— U.S. ——, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983); 42 U.S.C. § 1382c(3)(B) (1976).

## CONCLUSION

For the foregoing reasons, we reverse the order of the district court denying plaintiff's motion for judgment on the pleadings and dismissing the complaint. We direct that the matter be remanded to the administrative agency for further proceedings consistent herewith.

---

**4.** During the hearing, Rivera testified as follows:

Q. But tell me why you can't go to work?
A. My doctor said I cannot perform my last work or my prior work or any other work.
Q. Why?
A. Because of my health condition.
Q. Well, if the doctor told you to go to work, would you go to work?
A. Well, it would be very hard because of my sight.

Q. What sight?
A. My left sight.
Q. What about your left sight? Can you see without your left sight?
A. I can only see from my right side.
Q. Well, why would it be very hard if you're not driving?
A. It would be hard for me to use public transportation, to use the train.
Q. Why?
A. Without my sight and also because of my health.