**Brad ARMSTEAD, Petitioner,**

v.

**Shirley S. CHATER, Commissioner of Social Security, Respondent.**

No. 94–CV–1667 (JS).

United States District Court, E.D. New York.

July 20, 1995.

Charles E. Binder, and Robert Brigantic, Binder and Binder, Hauppauge, NY, for petitioner.

U.S. Attorney's Office, E.D. of New York by Daniel F. De Vita, and Stanley Alpert, Asst. U.S. Attys., Brooklyn, NY, for respondent.

## MEMORANDUM AND ORDER

SEYBERT, District Judge:

Petitioner Brad Armstead brings this action under 42 U.S.C. § 405(g) challenging a final determination of the Commissioner of Social Security [alternately, the "Commissioner" or the "Secretary"] which denied his application for disability insurance benefits under the Social Security Act [the "Act"]. Both parties have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Petitioner argues that the Administrative Law Judge [the "ALJ"] failed to evaluate properly the medical evidence and the testimony of the petitioner and a vocational expert. According to the petitioner, these errors require the reversal of the Commissioner's decision. The respondent, in turn, argues that the ALJ's decision is supported by substantial evidence, and that therefore the Commissioner's denial of disability benefits must be affirmed. Because the Court finds that the ALJ has not clearly articulated his reasons

for concluding that the petitioner did not suffer from a "listed" impairment, and moreover, has failed to analyze fully in his written decision the consequences of the petitioner's allegations of pain upon his ability to be gainfully employed, this matter is remanded to the Commissioner for further appropriate proceedings.

## BACKGROUND

Petitioner, a thirty-one year old male, filed an application for disability insurance benefits on January 28, 1992, alleging that the fracture of his left humerus rendered him incapable of engaging in any substantial gainful activity. Administrative Record ["R."] at 47–50, 148. His application was denied both initially, R. at 51, 60–61, and upon his request for reconsideration. R. at 64, 73–75. In a hearing held on August 19, 1993, R. at 145–74, the ALJ reopened petitioner's prior application filed on June 6, 1991, in accordance with 20 C.F.R. § 404.988(a). R. at 15, 173. Petitioner was represented by an attorney at the hearing. R. at 145.

Petitioner was injured while playing football on September 8, 1989. He was treated immediately by Dr. Harvey Fishman at the Mary Immaculate Hospital emergency room, where it was determined that he had sustained a fracture of his left humerus. R. at 109, 155. Dr. Fishman placed petitioner's left arm in a cast. R. at 133, 135. Subsequent to his initial consultation with Dr. Fishman, petitioner continued to see Dr. Fishman every four weeks, until April 17, 1990. R. at 109, 156.

On June 24, 1991, based upon his treatment of the petitioner from September 19, 1989 until April 17, 1990, Dr. Fishman completed a musculoskeletal report for the New York State Department of Social Services [DSS]. R. at 109–13. Dr. Fishman opined that as of April 17, 1990, petitioner was able to lift and carry a range of weight from five to ten pounds "occasionally," and from forty to fifty pounds "frequently."[1] Petitioner had no limitations on his leg control or on his ability to sit, stand, or walk. R. at 113. Dr.

Fishman also referred petitioner to an orthopedist for open reduction, internal fixation and bone grafting. R. at 109.

Petitioner saw Dr. Michael Katz on December 27, 1990 to obtain a second opinion. R. at 104. In a musculoskeletal medical report completed for the DSS, Dr. Katz diagnosed a malrotated atrophic non-union of the left humerus. Petitioner's range of motion at left elbow was 0–120 degrees, and he felt pain and tenderness at the fracture site. Dr. Katz assessed that petitioner was in need of open reduction, internal fixation and a bone graft. R. at 104. On March 4, 1991, Dr. Katz completed a disability form in which he checked boxes indicating that petitioner was house-confined, totally disabled for any occupation, and that his disability was indefinite. R. at 129.

Dr. K. Seo of the New York Diagnostic Centers performed a consultative examination of the petitioner on August 16, 1991. R. at 115–17. Dr. Seo noted that petitioner had no difficulty standing up from the sitting position on or off the examination table, and that his fine motor coordination of both hands was normal. Petitioner's left shoulder, elbow and wrist all displayed a normal range of motion. Muscle strength in petitioner's left hand rated four out of five. R. at 115. Dr. Seo noted that functionally, petitioner may have difficulty using his left arm. R. at 116.

On November 6, 1991, Dr. Katherine Gearity performed a consultative examination of the petitioner. R. at 119–23. Dr. Gearity observed no range of motion in the petitioner's left shoulder muscles, biceps, triceps, deltoids, or latissimus dorsi muscles. R. at 119. She opined that functionally, petitioner was unable to lift or carry any weight with his left arm. Petitioner's ability to push and/or pull was limited as a result of improper healing of the fracture. Dr. Gearity also noted that petitioner was emotionally and socially traumatized by the condition of his shoulder, which he had not used since his injury. R. at 123.

---

1. These remarks derive from boxes checked on the DSS musculoskeletal medical report. The Court observes that these remarks appear to be logically inconsistent.

72

Dr. Seo re-examined the petitioner on March 13, 1992. R. at 125–27. Petitioner wore an incomplete cylindrical cast (i.e., a long arm cast cut off above the elbow level). The cast was not functioning properly due to muscle atrophy. Muscle atrophy was diagnosed in the left deltoid area, left supraspinatus and infraspinatus areas, and left forearm. Petitioner's left elbow and wrist showed a normal range of motion. Functionally, Dr. Seo assessed the petitioner as not able to carry any weight with his left arm, or to use that arm at all. R. at 125–26.

On December 16, 1992, Dr. Michelle Gerwin examined the petitioner at the Hospital for Special Surgery in Manhattan. R. at 133–34. X-rays demonstrated an "oblique non-union of the junction of the middle and distal thirds of the humerus." Dr. Gerwin scheduled petitioner for an internal fixation and bone grafting, and prescribed a well-fashioned Sarmiento cast for the petitioner to wear until surgery. R. at 133.

On February 1, 1993, petitioner underwent surgery on his left humerus in a procedure that included an open reduction, and an internal fixation with a bone graft. R. at 135–41. Petitioner was in stable condition following surgery. R. at 138. Post-operative x-rays showed satisfactory alignment. R. at 139, 141. Occupational therapists instructed petitioner in active and active-assisted range of motion exercises of the left shoulder, elbow, and hand. Petitioner was discharged with an uninfected wound, and was given Vicodin for pain. R. at 136.

Petitioner returned to the Hospital for Special Surgery on February 17, 1993 complaining of pain. Dr. Gerwin and her colleagues found a fracture present in the mid-to-distal third of the diaphysis of the left humerus. Sclerotic margins were present at the fracture site, suggestive of a non-union. R. at 143.

Following a monthly visit to the clinic at the Hospital for Special Surgery on April 21, 1993, Dr. Edmund Kwan reported that petitioner had done well following his surgery. Petitioner's wound had completely healed, his range of motion of the elbows showed full flexion and full extension, and he had a full range of motion at the shoulder. X-rays showed the humerus was in good position and there was some evidence of union with the plate in place. Dr. Kwan recommended that petitioner return to the clinic in six weeks for further x-rays, and that he should continue to wear the Sarmiento brace. R. at 144.

Petitioner has completed two years of college, and received training in micro-assembly. R. at 91, 151–53. Petitioner's last job was as a meter reader from 1988 to 1989, in which capacity he entered meter readings into a hand-held computer. This job entailed constant standing and walking. R. at 91–92. Prior to that time, petitioner worked as a packer for a pharmaceutical company, a micro-assembler for an airplane manufacturer, and as a sorter for a shipping company. R. at 91, 151–54.

Since his injury in September 1989, petitioner has experienced considerable pain and discomfort. He initially used pain-killers, including codeine, but later resorted to aspirin. R. at 158. Petitioner testified that his doctor advised against doing work that involved any lifting. R. at 155. Though petitioner was unable to raise or lift anything with his left arm, he was able to grasp objects in his left hand. R. at 159. Petitioner has no problems with his right, dominant hand. R. at 148, 159–60. His injury did not affect his ability to walk, stand or climb stairs. R. at 159.

At the hearing before the ALJ, Lynn Mizzy Jonas, M.S. testified as a vocational expert. R. at 131–32, 165–72. Ms. Jonas classified petitioner's past employment as a meter reader as light, low-range, semi-skilled work. R. at 165–66. Petitioner's employment as a packer and sorter entailed heavy, unskilled work. R. at 166. Ms. Jonas testified that petitioner had no transferable skills. The most sophisticated task he performed was micro-assembly, which required bi-manual dexterity. R. at 166–67.

The ALJ posed a hypothetical to Ms. Jonas concerning a young male similarly situated to the petitioner, with a 2–year college education, work background and training similar to that of the petitioner, and a non-union fractured humerus in the non-dominant left arm. The hypothetical person was un-

able to use the left arm, but was able to grasp with the left hand, and was fully able to use the right arm and hand. R. at 167. Ms. Jonas testified that such person would not be able to work in the jobs in which the petitioner was previously employed, but would be able to perform work which required use of only the dominant arm and hand. R. at 167–68. According to Ms. Jonas, such positions included: (1) information clerk, which position numbered 4,700 in the regional area and 14,800 nationally, R. at 168; (2) telemarketing salesperson, which position numbered over 5,000 in the region and over 15,000 nationally, R. at 168–69; (3) a security guard monitoring television screens at a control center, which position numbered 4,800 in the region and 87,000 nationally, R. at 169–70; and (4) a ticket taker, who using one arm could perform simple grasping with the restricted arm, which position numbered 3,000 regionally, and 27,000 nationally. R. at 170.

Petitioner's attorney expanded the hypothetical to include a restriction that the individual's pain caused sleepless nights and lack of alertness on the job. Ms. Jonas responded that someone with such a restriction would not be able to perform in any of the positions she previously listed. R. at 171–72.

In a written decision rendered on October 27, 1993, R. at 15–20, the ALJ found that, although petitioner had "severe pain in his upper left arm and shoulder secondary to status post fracture of the left humeral shaft with non-union of the fracture," R. at 19, he did not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. § 404, Subpart P, App. 1. Accordingly, while the ALJ found the claimant's subjective complaints of pain to be credible, he nevertheless determined that there were jobs in the national economy he was capable of performing notwithstanding his impairment. R. at 19. The ALJ concluded, therefore, that petitioner was "not under a 'disability' as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. § 404.1520(f))." R. at 20.

Petitioner's request for review of this decision was denied by the Appeals Council on March 4, 1994. R. at 2–3. The instant action followed.

## DISCUSSION

■ The legal principles governing the Court's resolution of the instant motions are well settled. A claimant is entitled to disability benefits under the Act if he meets the insured status requirements of 42 U.S.C. § 423(c), and is unable to "engage in *any* substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (emphasis added); *see Wagner v. Secretary of Health and Human Servs.*, 906 F.2d 856, 860 (2d Cir.1990). The mere presence of an impairment, therefore, does not automatically direct a finding of a disability for purposes of the Act. *See Spears v. Heckler*, 625 F.Supp. 208, 210 (S.D.N.Y.1985).

The Commissioner has promulgated regulations establishing a framework in which to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (1994). Essentially, a five-step analysis of the claimant's alleged disability is required:

First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Secretary next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his

past work. Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform. *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam). "[T]he claimant bears the burden of proof as to the first four steps, while the Secretary" bears the burden of proof as to the final one. *Id.; see Ferraris v. Heckler,* 728 F.2d 582, 584 (2d Cir.1984); *Vasquez v. Secretary of Health and Human Servs.,* 632 F.Supp. 1560, 1563 (S.D.N.Y. 1986).

■ In evaluating the ALJ's ruling, the Court does not review the administrative record *de novo,* but rather considers whether the Commissioner's findings are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991); *Wagner,* 906 F.2d at 860; *Arnone v. Bowen,* 882 F.2d 34, 37 (2d Cir.1989). Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); *see Wagner,* 906 F.2d at 860 (quoting *Richardson,* 402 U.S. at 401, 91 S.Ct. at 1427).

■ "The substantial evidence test ... applies not only to the [Commissioner's] findings of fact, but also to the inferences and conclusions of law to be drawn from such facts." *Smith v. Shalala,* 856 F.Supp. 118, 121 (E.D.N.Y.1994) (internal quotations omitted). There are limits, however, upon the extent to which a reviewing court may permit an ALJ's conclusion to be based upon an unarticulated finding of fact or analysis, for it is the function of the Commissioner, and not a reviewing court, to pass upon the credibility of witnesses, and to set forth clearly its findings which form the basis for its decision. *See Ferraris,* 728 F.2d at 588; *Berry,* 675 F.2d at 469; *Vasquez,* 632 F.Supp. at 1563–64 (citation omitted).

A. *Analysis under Step Three of the Evaluation Process*

■ The petitioner first contends that the Commissioner improperly evaluated the med-

ical evidence concerning whether his impairment is of a type listed within Appendix 1 of the regulations for purposes of the third inquiry in the Commissioner's evaluation process. *See Berry,* 675 F.2d at 467. Specifically, petitioner argues that he is *per se* disabled because his ailment meets the criteria set forth under 20 C.F.R. § 404, Subpart P, App. 1, § 1.12, which provides coverage for:

Fractures of an upper extremity with nonunion of a fracture of the shaft of the humerus, radius, or ulna under continuing surgical management directed toward restoration of functional use of the extremity and such function was not restored or expected to be restored within 12 months after onset.

20 C.F.R. § 404, Subpart P, App. 1, § 1.12. "Listing 1.12 requires, in sum, that a claimant's impairment meet or equal the following criteria: (1) a non-union of a fracture; (2) functional limitations of 12–month duration or expected duration; and (3) continuing surgical management." *Davis v. Shalala,* 862 F.Supp. 1, 6 (D.D.C.1994). In connection with this inquiry, petitioner claims that Dr. Gerwin, his treating physician, attested that he suffered from a non-union fracture of the left humerus and that surgical management had not yet restored functioning. The petitioner also asserts that, under 20 C.F.R. § 404.1527(d)(2), Dr. Gerwin's opinion as a treating physician should be controlling as it is well supported and not inconsistent with other substantial evidence.

The following facts would appear to be relevant in determining whether the petitioner satisfies the criteria for being under "continuing surgical management."

(1) In September 1989, petitioner fractured his left arm. R. at 109, 155.

(2) In April 1990, Dr. Fishman recommended surgery, and referred the petitioner to another orthopedist for such procedure. R. at 109.

(3) In December 1990, Dr. Katz provided a second opinion which concurred with Dr. Fishman's recommendation of surgery. R. at 104.

(4) During the next two years, the petitioner had three consultative examinations: in August and November of 1991, and in March of 1992. R. at 115–17, 119–23, 125–27.

(5) In December 1992, Dr. Gerwin examined the petitioner as a treating physician, and scheduled him for surgery. R. at 133.

(6) On February 1, 1993, petitioner underwent surgery. R. at 137–38.

(7) On February 17, 1993, petitioner returned to Dr. Gerwin at the Hospital for Special Surgery in Manhattan, complaining of pain. R. at 143.

(8) In April 1993, an examination of the petitioner by Dr. Kwan showed some evidence of union of his fracture. Dr. Kwan recommended that petitioner return to the clinic in six weeks for further x-rays. R. at 144.

The ALJ's written decision, however, fails to make any explicit finding which demonstrates that he has considered whether the above circumstances, in the aggregate, constitute "continuing surgical management" for purposes of Listing 1.12. In his written decision, the ALJ found that

[t]he medical evidence establishes that claimant has constant pain in his left arm secondary to status post fracture of the left humeral shaft with non-union of the fracture. However, the medical evidence does not support a finding that claimant's impairments meet or equal the criteria of a listed impairment. *Particular consideration was given to Listing 1.12. (Fractures of an upper extremity).*

R. at 16 (emphasis added). The ALJ further held, as his "third finding," that the claimant "does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P Regulations No. 4." R. at 19. Unfortunately, the ALJ's written decision does not set forth the reasoning that he employed in reaching this conclusion.

In affirming the ALJ's decision, and rejecting the claimant's contention that the ALJ incorrectly found his impairment not to be within the purview of Listing 1.12, the Appeals Council chose not to discuss the ALJ's written decision. Instead, the Appeals Council referred to the ALJ's tentative finding, stated on the record at the hearing, *see* R. at 174, that this case did not involve "continued surgical management." R. at 2. At the hearing, the ALJ concluded his discussion of this matter with the following remarks:

It's not under continuing surgical during this period. I . . . disagree with that. I . . . can understand it. I understand the circumstances, too. But still—*I will take it into account.*

R. at 174 (emphasis added). In support of its position, the Appeals Council noted that only one surgical procedure had been performed upon the petitioner, and that this procedure was not performed until more than three years after he fractured his arm. The Appeals Council further observed that during a significant portion of that time, the petitioner was not under medical treatment. Consequently, the Appeals Council found that the ALJ properly concluded that his "impairment is not of the severity described in section 1.12 of the Secretary's Listing of Impairments." R. at 2.

The Court regards both the ALJ's and the Appeals Council's analysis of the petitioner's circumstances, and specifically, the nature of his treatment that ultimately culminated in surgery, to be insufficient to support the conclusion that the Commissioner's determination is supported by substantial evidence. *See Richardson,* 402 U.S. at 401, 91 S.Ct. at 1427. Indeed, in summarily concluding that a gap in medical treatment undermines a finding of "continuing surgical management," the Commissioner fails to consider, among other things, the following issues:

(1) The definition of "surgical management," and whether under the claimant's circumstances it may be appropriate to regard his consultative examinations as a part thereof given that he was previously recommended for surgery;

(2) The period of time that must elapse in order for "surgical management" to be regarded as "continuing;"

(3) The period of time that must elapse between either two separate recommendations for surgery, or a recommendation for

surgery and the surgical procedure itself, in order for "surgical management" to be stripped of its "continuing" status; and

(4) The circumstances whereby a claimant will be permitted to offer evidence of his financial condition in explaining why he failed to undergo surgery shortly after its recommendation by a treating physician.

In view of these unaddressed issues, each of which is substantially implicated in connection with the petitioner's claim for disability benefits, the Court concludes that the Commissioner has not adequately explained the weight she accorded the probative evidence in the record in determining that the petitioner was not under "continuing surgical management." Indeed, the Court is left to speculate whether all the circumstances of the petitioner's claim were thoroughly analyzed, or instead were overlooked. *See Ferraris,* 728 F.2d at 588; *Berry,* 675 F.2d at 469. Consequently, the Court is unable to find that the Commissioner's determination is supported by substantial evidence, and in this posture, a remand of this case to the Commissioner is appropriate. In remanding this case, the Court emphasizes that the determination of "continuing surgical management" merits a careful explanation of the bases for the ALJ's reliance on, or disregard, of any and all relevant evidence. The Court recommends that the issues enumerated above be used as a framework in analyzing the evidence, in determining whether the claimant has satisfied the criterion of "continuing surgical management" for purposes of Listing 1.12.

**B. *Analysis under Step Five of the Evaluation Process***

 The Court also wishes to address the fifth inquiry in the evaluation process, under which the Commissioner bears the burden of establishing that the claimant, although unable to perform his past work, nevertheless is able to perform other work in the national economy. *See Berry,* 675 F.2d at 467. Specifically, the Court notes that the ALJ did not fully explain his reasons for concluding that, although the petitioner's subjective complaints of pain were credible, the level of pain was insufficient to prevent his gainful employment in the national economy. R. at 17, 19. Under the law of the Second Circuit, the record must show that the claimant's allegations of pain were properly weighed. *See Mimms v. Heckler,* 750 F.2d 180, 185–86 (2d Cir.1984); *Rivera v. Schweiker,* 717 F.2d 719, 724–25 (2d Cir. 1983). In addition, the extent to which the ALJ regards a claimant's testimony to be credible must be clearly explicated in the written decision. *See Berry,* 675 F.2d at 469. Accordingly, the ALJ is respectfully requested to make clear his finding upon the remand of this case.

### CONCLUSION

In accordance with the foregoing analysis, this matter is remanded to the Commissioner for further appropriate proceedings, with specific instructions provided herein concerning the third and fifth steps of the Commissioner's evaluation process.

SO ORDERED.