**Stephen STUPAKEVICH, Petitioner,**

v.

**Shirley S. CHATER, Commissioner of Social Security, Respondent.**

No. 94–CV–5005 (JS).

United States District Court, E.D. New York.

Dec. 5, 1995.

Binder and Binder by Charles E. Binder, and Robert Brigantic, Hauppauge, New York, for Petitioner.

Zachary W. Carter, United States Attorney, Eastern District of New York by Nancy A. Miller, and Millicent Clarke, Assistant United States Attorneys, Brooklyn, New York, for Respondent.

*MEMORANDUM AND ORDER*

SEYBERT, District Judge:

█ Petitioner Stephen Stupakevich brings this action under 42 U.S.C. § 405(g) challenging a final determination of the Commissioner of Social Security [alternately, the "Commissioner" or the "Secretary"] which denied his application for disability insurance benefits under the Social Security Act. Both parties have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Petitioner argues that the Administrative Law Judge [the "ALJ"] failed to evaluate properly the medical evidence, the testimony of the petitioner, and the relevant vocational factors. The Commissioner, in turn, contends that the ALJ's decision is supported by substantial evidence in the record. Based upon the Court's review of the administrative record, the Court finds the ALJ's determination that the petitioner retained the ability to perform a significant number of jobs in the national economy to be supported by substantial evidence. Accordingly, for the reasons more fully discussed below, the decision of the Commissioner denying benefits is affirmed.

*FACTUAL BACKGROUND*

Petitioner Stephen Stupakevich is a 46 year old man, who was born on April 27, 1949. Tr. at 177. He is a high-school graduate with some college credit, and worked in the aerospace industry as a lathe operator (machinist) for L & F Manufacturing and IBM. *Id.* at 100, 179, 182–83. Petitioner claims that injuries to his right arm, in conjunction with an inguinal hernia and depression, caused him to become disabled on April 3, 1992.

A. *Medical History prior to April 3, 1992*

The record indicates that petitioner underwent a resection of a ganglion neuroma from the right axillary area on July 24, 1989. *Id.* at 155–63. Wrist flexion, hand use, and use of the distal arm and forearm were normal but petitioner exhibited signs of nerve deficit in his biceps and deltoid muscles. *Id.* at 157. Petitioner had difficulty using his right arm, flexing his right elbow and using his right shoulder normally. *Id.* at 146. The final analysis indicated that the C5 root was compromised in order to remove the tumor, *id.* at 157, causing injury to the right brachial plexus at the C5–C6 level. *Id.* at 139, 154.

An electromyography (EMG) conducted two days after the operation, and nerve conduction studies performed by Dr. Jack Sokolow revealed sensory loss along the C5–C6 dermatome on the right side and motor deficit along the deltoid, biceps and bracheoradialis on the right side. *Id.* at 118–19. Petitioner had good wrist extension, hand grasp and triceps. Dr. Sokolow also found electrical evidence of mild carpel tunnel syndrome, but the petitioner was asymptomatic. *Id.* at 119.

On August 28, 1989, the petitioner paid his first visit to Dr. Mauro Romita. *Id.* at 143. The record states that petitioner showed an inability to flex the elbow and abduct the shoulder during an exam conducted on August 30, 1989. The shoulder joint showed signs of weakness as well.

On September 8, 1989, the petitioner underwent multiple nerve graft reconstruction of the brachial plexus at Booth Memorial Medical Center. *Id.* at 126–33.

On January 31, 1990, Dr. Finger performed a consultative exam on behalf of the Social Security Administration and noted that petitioner's sensory loss was improved or eliminated following the reconstructive surgery. Petitioner could make a full fist with his right hand, and had grip strength of grade four out of five. He could also flex and extend his right wrist normally. However, the petitioner still exhibited nearly complete loss of abduction of the right humerus and could only voluntarily flex the right humerus about 40 degrees. Dr. Finger found a complete loss of voluntary flexion at the right elbow but full voluntary extension. He also noted near complete atrophy of the right deltoid muscle. Dr. Finger agreed that there was injury to the right brachial plexus resulting in loss of function. He also mentioned petitioner's claims of a history of bronchial asthma, but noted the absence of any clinical evidence in support of such claims. *Id.* at 134–38.

B. *The "treating physician's" diagnosis*

On February 23, 1990, Dr. Mauro Romita, a plastic surgeon, noted that his initial exam of the petitioner was conducted on August 30, 1989. *Id.* at 139. The results of the examination were consistent with the findings of the other examining physicians. However, Dr. Romita further opines that the petitioner "is now considered totally disabled and the prognosis is guarded." *Id.* at 141.

On January 12, 1993, Dr. Romita noted that he had seen petitioner approximately fifty times since 1990. During that time he found petitioner to have gradually improved his biceps flexion to essentially normal range and that his pronation and supination were weak but with full range of motion. There was very little return of the deltoid muscle and it showed weak spontaneous abduction, and that despite attempts at rehabilitation the petitioner "still has a marked disability with regard to the right shoulder." *Id.* at 144. Petitioner's bicep had returned to approximately 50% of normal, but abduction was still limited to 20–25 degrees. Finally, he noted that the rehabilitation consults felt that the treatment had plateaued. *Id.*

On July 20, 1993, Dr. Romita reiterated that petitioner's prognosis was guarded and that "[a]t this point he must be considered significantly disabled with regard to the use of his right arm." *Id.* at 154. On October 28, 1993, Dr. Romita stated, in a one-sentence letter, that "the patient has been disabled since 4/2/92." *Id.* at 153. However, Dr. Romita had previously claimed the petitioner to be disabled since as early as February 23, 1990. *Id.* at 141.

C. *Dr. Seo's and Dr. Cepellos' diagnosis*

On January 5, 1993, Dr. K. Seo performed a consultative examination. *Id.* at 146–47. He observed that petitioner walked with a normal gait and had no difficulty standing from a sitting position or getting on and off the examination table. *Id.* at 146. Petitioner's cervical spine and left shoulder both showed normal range of motion. Dr. Seo termed the right shoulder as "frozen" with flexion and abduction limited to 15 degrees. *Id.* He noted the severe atrophy of the supraspinatus, infraspinatus, and deltoid as well as atrophy of the biceps and triceps muscles. Muscle strength of the right upper arm and shoulder was grade three out of five. Dr. Seo also found the petitioner to have normal range of motion of elbows and wrists with no sensory defect of the right arm. *Id.* Fine motor coordination of both hands was normal with grip strength grade of five out of five. *Id.* at 147. He noted that petitioner was functionally unable to use the right arm or carry and lift any objects above the shoulder. *Id.*

Dr. Cepellos stated, in a brief letter dated January 14, 1994, that the petitioner was under his care, that he had lost the use of his right arm, and that he has a right inguinal hernia for which surgery is required. *Id.* at 169. In a Residual Functional Capacity Form of the same date, Dr. Cepellos noted that petitioner could sit eight hours and stand or walk for two hours during an eight-hour day, and that he could frequently climb stairs, reach for objects, grasp them and do fine manipulations with both hands. Dr. Cepellos stated, however, that petitioner could never lift, push or pull any weight with his right arm, and should not drive a car. Dr. Cepellos further noted that petitioner's injuries caused pain and that the prescribed medications caused drowsiness and impaired concentration. *Id.* at 167–68.

D. *Vocational History*

From 1972 through 1992, petitioner's job as a machinist in the aerospace industry required him to read blueprints and use specialized machinery. *Id.* at 100, 181–83. It was necessary for him to walk eight hours a day, stand eight hours a day, and constantly bend, lift, and carry. The average weight lifted or carried was seventy-five pounds. *Id.* at 101, 190. Petitioner returned to L & F Manufacturing approximately four months after his reconstructive surgery. He continued to work for eight hours per day on light duty, with no lifting or carrying until April 3, 1992, when he was laid off. *Id.* at 96, 181–82.

Petitioner applied for and received unemployment benefits from April 1992 to February 1993. *Id.* at 207. He went on job interviews for machinist and salesman positions.

*Id.* at 207–08. Petitioner received a malpractice settlement in 1992. *Id.* at 196.

### E. *Petitioner's Testimony*

Petitioner admitted at his hearing that he drives locally and occasionally takes public transportation on his own. *Id.* at 99, 134, 178. He sometimes picks up his children from school, takes walks, visits friends and relatives, goes shopping with his wife, watches television, naps during the day and has normal social interactions. *Id.* at 99, 208–10. On occasion he needs help getting dressed or washed. His wife cuts his meat, but he can eat using his left hand. *Id.* at 106, 211. He states that he has pain in the right shoulder, right back, right leg and right foot and that sometimes his fingers go numb. In addition, he sometimes experiences pins and needles in his hand and down his right leg after walking two or three blocks, and experiences pain on the bottom of his foot when walking too long. *Id.* at 201, 204–05.

Petitioner also testified that he is prescribed Proventil for bronchial asthma, that he has been diagnosed as having a hernia, and that he has trouble sleeping. For three years he has taken Tylenol with Codeine,[1] which he claims makes him constipated, nauseous, and drowsy. *Id.* at 210, 214.

### F. *Vocational Evidence*

A vocational expert, Helen Frank Jenkins, testified at the January 10, 1994 hearing that petitioner's past relevant work generally would be classified as skilled and medium, but as petitioner described it, his job was close to heavy work. These skills are not transferable. *Id.* at 220. In response to the ALJ's first hypothetical question, she testified that he could not perform his past work. *Id.* at 222–24. In response to the second hypothetical, which assumed petitioner was unable to use his right arm, she stated that considering petitioner's age and education and assuming he could perform sedentary work by lifting ten pounds with his left hand, petitioner could perform such jobs as a receptionist, information clerk, or dispatcher.

*Id.* Nationally, there are in excess of 100,000 jobs for receptionists and an additional 100,000 jobs for dispatchers. *Id.* In response to the ALJ's third hypothetical, which assumed the credibility of the petitioner's entire testimony, Ms. Jenkins testified that, taken in combination, the petitioner would be precluded from engaging in competitive employment. *Id.* at 227–28.

### G. *Procedural History*

Petitioner filed his application for disability insurance benefits on November 21, 1992, alleging disability since April 3, 1992. *Id.* at 47–50. The application was denied initially, *id.* at 61–63, and on reconsideration. *Id.* at 76–78. Petitioner then requested a hearing, which was held on January 10, 1994. *Id.* at 172. The ALJ, before whom petitioner appeared with counsel, considered the case *de novo* and, on April 29, 1994, found the petitioner not to be disabled. *Id.* at 15–24. The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied petitioner's request for review on September 16, 1994. *Id.* at 3–4. This action followed.

## DISCUSSION

### I. *Substantial Evidence Standard*

■ The legal principles governing the Court's resolution of the instant motions are well settled. A claimant is entitled to disability benefits under the Act if he meets the insured status requirements of 42 U.S.C. § 423(c), and is unable to "engage in *any* substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (emphasis added); *see Wagner v. Secretary of Health and Human Servs.,* 906 F.2d 856, 860 (2d Cir.1990). The mere presence of an impairment, therefore, does not automatically direct a finding of a disabil-

---

**1.** Tylenol with Codeine tablets are indicated for the relief of mild to moderately severe pain. *See* Physicians' Desk Reference 1365 (48th ed. 1994).

ity for purposes of the Act. *See Spears v. Heckler*, 625 F.Supp. 208, 210 (S.D.N.Y.1985).

■ The Commissioner has promulgated regulations establishing a framework in which to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (1994). Essentially, a five-step analysis of the claimant's alleged disability is required:

First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Secretary next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982) (per curiam). "[T]he claimant bears the burden of proof as to the first four steps, while the Secretary" bears the burden of proof as to the final one. *Id.; see Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir.1984); *Vasquez v. Secretary of Health and Human Servs.*, 632 F.Supp. 1560, 1563 (S.D.N.Y. 1986).

■ In evaluating the ALJ's ruling, the Court does not review the administrative record *de novo*, but rather considers whether the Commissioner's findings are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir.1991); *Wagner*, 906 F.2d at 860; *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir.1989).

Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); *see Wagner*, 906 F.2d at 860 (quoting *Richardson*, 402 U.S. at 401, 91 S.Ct. at 1427).

■ "The substantial evidence test ... applies not only to the [Commissioner's] findings of fact, but also to the inferences and conclusions of law to be drawn from such facts." *Smith v. Shalala*, 856 F.Supp. 118, 121 (E.D.N.Y.1994) (internal quotations omitted). There are limits, however, upon the extent to which a reviewing court may permit an ALJ's conclusion to be based upon an unarticulated finding of fact or analysis, for it is the function of the Commissioner, and not a reviewing court, to pass upon the credibility of witnesses, and to set forth clearly its findings which form the basis for its decision. *See Ferraris*, 728 F.2d at 588; *Berry*, 675 F.2d at 469; *Vasquez*, 632 F.Supp. at 1563–64 (citation omitted).

## II. *Analysis of petitioner's disability claim*

■ The opinion of a treating physician is only given controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.1993) (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). Even though it may not be entitled to controlling weight, the opinion of a treating physician nevertheless is accorded considerable weight when it is supported by relevant evidence, such as "medical signs and laboratory findings," 20 C.F.R. § 404.1527(d)(3), and is consistent "with the record as a whole." 20 C.F.R. § 404.1527(d)(4).

In the present case, the petitioner claims that Dr. Romita's opinion that the petitioner has been disabled since April 3, 1992 is entitled to controlling weight. *See* Tr. at 153–54. Such reasoning blurs the distinction between Dr. Romita's diagnosis of the loss of function

in petitioner's right arm and the ALJ's determination of whether petitioner met the statutory definition of disability. Relevant to this determination, the regulations provide:

> Opinions that you are disabled. We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

20 C.F.R. § 404.1527(e)(1). Thus, although Dr. Romita's diagnosis of the loss of function in petitioner's right arm is controlling as to this specific malady, it is not determinative of whether petitioner can no longer do his past relevant work because of severe medically determinable impairments, or whether in light of his age, education, and work experience, such impairments prevent him from doing any work that exists in the national economy. See 20 C.F.R. § 416.920(f).

The petitioner next contends that the ALJ improperly evaluated his credibility in finding that his testimony concerning his pain and the related limitations upon the functioning of his right arm were inconsistent with the medical evidence. See Tr. at 22. Specifically, petitioner contends that severe pain, drowsiness and depression precluded him from engaging in any substantial gainful activity. The ALJ found the petitioner's assertions to be inconsistent with the record.

A review of the administrative record supports the ALJ's determination that the petitioner's subjective complaints of pain did not preclude him, at the very least, from obtaining other gainful employment in the national economy. First, the medical record fails to suggest that the petitioner's medical condition changed between the time he resumed work in January 1990, and April 1992, the point at which he was laid off and filed his claim for disability. Second, the petitioner was prescribed only Tylenol with Codeine, which the Physicians' Desk Reference indicates for the relief of mild to moderately severe pain. See supra note 1. Correlative-

ly, a reasonable inference may be drawn that the ALJ did not regard the side effects of drowsiness related to this medication to impair materially the petitioner's ability to perform work in the national economy. See Smith, 856 F.Supp. at 121 (substantial evidence analysis also applies to inferences drawn from facts). Third, while petitioner complains of pain in his right back, right leg and right foot, the record provides no medical diagnosis or other findings that support a medical condition that reasonably could be expected to produce such pain. See 20 C.F.R. § 404.1529. Fourth, although Dr. Cepellos reported a right inguinal hernia that will require surgical treatment, he did not state any complications related thereto. Indeed, this physician did not suggest surgery as an immediate remedy and the ALJ understandably took this to imply that this condition was not severe. Fifth, the petitioner's activities, such as riding a bicycle, picking up his children from school, driving locally, engaging in normal social interaction, and his ability to work with the impairment he now alleges to be disabling, serve to contradict his subjective complaints and allegations. Tr. at 19. Sixth, although petitioner states that he and his wife received marriage counseling from a social worker, see id. at 212–13, and that he has experienced depression, see id. at 213, there is no medical evidence in the record to establish that petitioner has a mental impairment. Finally, the record shows that the petitioner's allegations of pain were properly weighed, see Mimms v. Heckler, 750 F.2d 180, 185–86 (2d Cir.1984); Rivera v. Schweiker, 717 F.2d 719, 724–25 (2d Cir. 1983), and that the extent to which the ALJ regarded claimant's testimony as credible was clearly explicated in the written decision. Tr. at 22; see Berry, 675 F.2d at 469.

The petitioner's final argument alleges that the ALJ improperly evaluated the vocational factors. In particular, petitioner contends that § 201.00(h) of Appendix 2 mandates a finding of disability in light of the vocational expert's determination that petitioner can no longer perform his past relevant work or the full range of sedentary work. Moreover, the petitioner directs the Court's attention to the vocational expert's statement that if petition-

er's entire testimony regarding his pain were accepted as true, there would be no jobs in the national economy that he could perform.

A review of § 201.00(h) reveals that its application does not compel the conclusion that the petitioner suggests. Specifically, this regulation provides that

> age is a more positive factor for those who are under age 45 and is usually not a significant factor in limiting such an individual's ability to make a vocational adjustment, even an adjustment to unskilled sedentary work, and even where the individual is illiterate or unable to communicate in English. However, a finding of disabled is *not precluded* for those individuals under age 45 who do not meet all of the criteria of a specific rule and who do not have the ability to perform a full range of sedentary work.

*Id.* (emphasis added). Petitioner would take the discretionary language of the regulations and have the Court construe it as directing a determination in favor of benefits. Petitioner was under the age of 45 when he filed for disability, *see* 20 C.F.R. § 404.1563, and is a high-school graduate with some college credit. *See* 20 C.F.R. § 404.1564. While the ALJ did confirm that the petitioner was unable to perform his past work as a machinist, the record is clear that she considered the vocational factors of age, education, and work experience in evaluating whether there were other jobs that the petitioner could perform in the national economy.

The record contains, and the ALJ rested her decision upon, the substantial evidence showing that while the petitioner's right shoulder was essentially "frozen," both of his hands retained their dexterity. *See* Tr. at 19 (ALJ's decision cites finding of Dr. Cepallos, a treating physician, that petitioner could perform fine manipulations with both hands. *See* Tr. at 167.), 20 ("Claimant retains the ability to ... use the right hand for grasping and fine manipulation and retains the ability to perform sedentary work that does not require lifting, carrying or reaching with the right upper extremity."), 23 ("If the claimant had the capacity to perform the full range of sedentary work, Section 404.1569 of Regulation No. 4 and Rules 201.21 and 201.28, Table No. 1 of Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion that he is not disabled. If the range of sedentary work were significantly compromised, section 201.00(h) of Appendix 2 indicates that a finding of disabled would be appropriate."). The presence of bilateral manual dexterity therefore distinguishes the petitioner's case from example # 1 set forth in section 201.00(h) of Appendix 2 to the regulations, which petitioner cites to support his position that a finding of disability is indicated. Further, although petitioner's work experience is not transferable, the vocational expert stated that he could perform as a dispatcher, an information clerk, or a receptionist for which there are approximately 200,000 positions in the national economy. *See* Tr. at 224. In light of this evidence, the ALJ's evaluation that the petitioner's vocational abilities lent themselves to the procurement of some other employment in the national economy was reasonable. Accordingly, the decision of the Commissioner denying benefits must be affirmed.

*CONCLUSION*

For the foregoing reasons, the decision of the Commissioner denying benefits is affirmed as supported by substantial evidence.

SO ORDERED.