**Shawna KULESZO F/K/A/ Dillon, Plaintiff,**

**v.**

**Jo Ann B. BARNHART,**[1] **Commissioner of Social Security, Defendant.**

**No. 01–CV–6518 CJS(B).**

United States District Court,
W.D. New York.

Sept. 30, 2002.

---

1. Ms. Barnhart is substituted for Acting Commissioner Larry G. Massanari pursuant to Federal Rule of Civil Procedure 25(d)(1).

Mark M. McDonald, Esq., Bond and Mc-Donald, P.C., Geneva, for the Plaintiff.

Kathleen M. Mehltretter, United States Attorney, By Brian M. McCarthy, Assistant United States Attorney, Rochester, for the Defendant.

───────

DECISION AND ORDER

SIRAGUSA, District Judge.

## I. INTRODUCTION

Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner") who denied her application for disability benefits. Before the Court are both plaintiff's motion (document # 5), and the Commissioner's motion (document # 9) for judgment on the pleadings. Oral argument was heard by the Court on August 22, 2002. For the reasons stated below, the Court grants plaintiff's motion, reverses the Commissioner's decision and remands solely for calculation of benefits.

## II. PROCEDURAL BACKGROUND

On February 28, 1994, plaintiff filed an application for disability insurance benefits and supplemental security income benefits. Her request for benefits was denied by notice dated May 10, 1994, and then on reconsideration by notice dated September 27, 1994. After a hearing before an Administrative Law Judge ("ALJ"), a decision was issued, dated September 21, 1995, denying plaintiff's claim for benefits. The Appeals Council, by order dated July 2, 1996, remanded the matter to the ALJ to obtain testimony from a Vocational Expert ("VE").

After a second hearing before the same ALJ, a decision dated March 19, 1997, was issued again denying plaintiff's claim for benefits. The Appeals Council remanded the matter a second time by order dated February 9, 1999, requiring the ALJ to allow plaintiff's representative to question the VE concerning the potential side effects of plaintiff's medications, potential loss of concentration ability, and the impact of those factors on the occupational base. A third hearing was held before a different ALJ with the same result, that is, by decision dated June 4, 1999, plaintiff's claim for benefits was denied for a third time. The Appeals Counsel, on September 14, 2001, affirmed the June 4, 1999 ALJ's decision, making it the Commissioner's final decision in this case. Plaintiff filed this action on October 19, 2001.

## III. PLAINTIFF'S WORK HISTORY

Plaintiff's work history can be briefly stated. She has past relevant work experience as a hospital dietary aide and custodian, which the ALJ found she was no longer able to perform. Plaintiff was born on September 28, 1969, has an eleventh grade education and a general equivalency diploma. She left her last job as a housekeeper for Cornell University and before

that, she had worked at Schuyler Hospital as a dietary aide from 1987 to 1990. She has not worked since April 15, 1991.

## IV. MEDICAL HISTORY

Plaintiff was first diagnosed with diabetes mellitus in 1987. As early as January 16, 1991, plaintiff began to experience numbness in both of her legs. She had decreased vibratory senses in her toes. Her doctor[2] found that she had lateral cutaneous neuropathy and questionable early diabetic foot neuropathy. In July of 1992, she was having numbness and tingling in her left hand. She also complained of her left hand and left foot curling up. Examination by MHE[3] on July 24, 1992, revealed thenar wasting on the right side as well as on the left side of her hands. She had achiness in her hands and the left foot as well. It was felt that she had a mild diabetic neuropathy which was intensifying. On Sunday, February 7, 1993, plaintiff went into a diabetic shock and was seen by her doctor[4] on the following Tuesday with continuing problems with stiffness in her hands. Her blood sugars at home were "real bouncy." R. at 449.

She saw Dr. Russell Woglom on October 27, 1993, and complained of having trouble with her hands, including the inability to "snap[5] buttons", as well as tightness and cramping. Dr. Woglom opined that she had decreased manual dexterity of unknown etiology.

Plaintiff next saw Dr. Daniel Britton, a neurologist, on December 9, 1993. Her medical history indicated problems with weakness and stiffness of her hands for approximately two years, worsening in the last couple of months prior to Dr. Britton's examination. Plaintiff informed Dr. Britton, at the examination, that she was having difficulty using her hands for writing and other purposes, that her hands were weak, that she had numbness in her fingertips, and that she had also noticed that her left leg had gotten weaker and was smaller than her right. Dr. Britton made the following findings with respect to plaintiff: decreased sensation on the right side of the trunk; right foot had decreased sensation that was bilateral and compatible with diabetes; decreased sensation on the right side of the body compared to the left; definite wasting of the intrinsic muscles of the hands, both from median and ulnar nerve distribution, which was fairly symmetrical in both hands; the thenar eminence on the right side was more wasted than on the left; some weakness in the deltoid biceps and triceps; weakness and wasting of the left leg, that is, 2 cm. at the calf and 2–4 cm. at the thigh; a definite Babinski[6] on the left, no response on the right; and a slightly spastic gait. Dr. Britton's impression was that plaintiff might have cervical myelopathy and recommended an MRI to rule out a syrinx or other cervical spinal lesion. He wrote in his report that he was not sure of the cause of this "definitely disabling condition that is progressive." R. at 271.

On December 16, 1993, Dr. Britton undertook a nerve conduction and an electro-

---

2. The doctor's signature on the medical record is illegible. R. at 445–46.

3. Possibly Dr. Michael Eisman at Schuyler Hospital.

4. The doctor's signature in the notes is illegible and the notes do not detail the circumstances surrounding plaintiff's diabetic shock. R. at 449.

5. The words, "can't snap buttons," appear in the notes. R. at 288.

6. Babinski reflex, backward flexion of the big toe when the sole of the foot is stimulated. Webster's Medical Dictionary (new rev. ed.1994) at 25.

myogram study, which showed definite polyneuropathy related to diabetes that was both demyelinating and axonal. The testing pointed to a poly or possibly even a mononeuritis multiplex or some problem with individual nerves related to diabetes. Dr. Britton ordered a CAT Scan to rule out a cerebral lesion. If the test was normal,[7] he wrote, then he would be confident that her problems related mainly to diabetes and that they were more severe than usually seen.

Dr. Britton referred plaintiff for physical therapy treatment. However, because plaintiff was suffering from diabetic neuropathy in both hands, the physical therapist thought that there was nothing she could do to help plaintiff. Plaintiff was seen again on March 2, 1994, by Dr. Woglom. Her blood sugars had been fluctuating, and Dr. Woglom found that she had polyneuropathy consistent with diabetic neuropathy. Dr. Woglom also reported wasting of the thenar eminence.

The balance of the medical records regarding her continued treatment do not appear to show any improvement in her neuropathy. It appears her hand impairment worsened with the onset of early flexion contractures of all the digits of the right hand. *See* R. at 451. Additionally, on August 22, 1997, Dr. Beth Bollinger, an orthopedic surgeon, reported that, beginning in June of 1997, plaintiff's difficulties progressed to include her feet. An x-ray of her left foot indicated degenerative and erosive arthritic changes involving the cuneiform bones of the left foot, together with the joints between the first, second and third metatarsals and cuneiform bones. On September 4, 1997, due to con-

tinued pain in the left foot, Dr. Bollinger recommended surgery for first, second and third tarsometatarsal fusion with a possible bone graft. Finally, there are numerous incidents where plaintiff was hospitalized due to her inability to control her blood sugars, although Dr. Michael Eisman at Schuyler Hospital opined that her inability to do so was due to her lack of compliance with his instructions. *See* R. at 262, 320.

## V. NON–MEDICAL EVIDENCE

Plaintiff is claiming an onset date of April 15, 1991. Prior to March 31, 1993, her date last insured, her hands started to deteriorate, that is they lost muscle and become weaker. She testified that she had difficulty tying her shoes and that she experienced very bad cramping in the back of her legs and hands three to four times per week. She also testified that she became very tired when using her hands, or when walking, and would have to sit down.

Additionally, she indicated that she has experienced highs and lows in her blood sugars since 1991–1992. She stated she had periods of high blood sugar approximately twelve to thirteen times out of a month, and that it was brought on by sickness, daily stress or physical activity. She stated that symptoms accompanying the high blood sugar levels included blurred vision, nausea and headache. She said that the highs would last anywhere from forty-five minutes to one hour, which was the amount of time that it took her to bring her blood sugars under control. She also testified that during the same period of time, she experienced low blood sugar

---

7. The Record before the Court contains medical records received from Dr. Britton dating from 12/9/93 to 1/11/94. R. at 185 (index of exhibits). Neither those records, nor the index, indicates any report from a CT scan dating from late 1993 or early 1994. Dr.

Britton's letter of November 6, 1996, does not mention the CT scan results, but does conclude that her symptoms were, "generally associated with a severe neuropathy and generally is fairly advanced." R. at 386.

episodes. She stated that she experienced from nine to ten episodes a month at unpredictable times and that the symptoms included inability to concentrate, irritability and confusion. She testified that she has continued to experience these highs and lows despite taking her insulin.

Plaintiff further testified that she was able to do some grocery shopping and housework, but has always required assistance from others. She also said she required frequent breaks from any physical activity.

Currently, she claims she still has the cramping in her hands, arms, and the back of her legs and her feet. She further claims that she is experiencing pain and stiffness in her left hip. She says that her hands lock up and she has to smooth out the stiffness, that this happens approximately three to four times per week, and that It takes approximately five to ten minutes before the pain is gone, so that she can use them again. She describes the presence of pain in addition to stiffness. She also alleges that the symptoms of the neuropathy started in 1992 and since that time have become progressively worse.

## V. DISCUSSION

### A. THE STANDARD OF REVIEW

■ The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998). It is well settled that

> it is not the function of a reviewing court to determine *de novo* whether the claimant is disabled. Assuming the Secretary [Commissioner] has applied proper legal principles, judicial review is limited to an assessment of whether the findings of fact are supported by substantial evi-

dence; if they are supported by such evidence, they are conclusive.

*Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 231–32. Where there are gaps in the administrative record or where the Commissioner has applied an incorrect legal standard, remand for further development of the record may be appropriate. *Id.* at 235. However, where the record provides persuasive proof of disability and a remand would serve no useful purpose, the Court may reverse and remand for calculation and payment of benefits. *Id.*

### B. THE STANDARD FOR FINDING A DISABILITY

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Social Security Act § 223(d)(1)(A), 42 U.S.C. § 423(d)(1)(A); *Schaal,* 134 F.3d at 501. The Social Security Administration ("SSA") has promulgated regulations which establish a five-step sequential analysis an ALJ must follow:

> First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities." If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed,

the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal,* 134 F.3d at 501 (citations and internal quotation marks omitted).

## C. THE ALJ'S DECISION

The ALJ determined that plaintiff met the disability insured status requirements of the Social Security Act on April 15, 1991, the date she became unable to work, and continued to meet them through March 31, 1993. At step one of the required sequential analysis, he found that plaintiff was not engaged in substantial gainful activity.

At step two, he found that the medical evidence established that plaintiff has severe impairments (diabetes mellitus and diabetic neuropathy of the hands). At step three, the ALJ determined that she did not have an impairment or combination of impairments listed in, or medically equal to one listed in, Appendix 1, Subpart P of Regulation No. 4. At step four, he found that plaintiff was unable to perform her past relevant work as a dietary aide, as it was more than sedentary in exertional requirements.

Finally, at step five of the sequential analysis, the ALJ determined that plaintiff, at age 29 with a high school equivalency diploma, retained the residual functional capacity to perform sedentary work, not involving fine manipulation and that she could, during an eight-hour work day, stand and walk for two hours, sit for six hours and could lift and carry ten pounds.

In that regard, he found that plaintiff's allegations of symptoms were not credible to preclude sedentary work not involving fine manipulation. Additionally, he found that the Commissioner had met her burden of proof and that there existed, in significant numbers in the national economy, sedentary jobs not involving fine manipulation, and gave as examples certain cashier jobs and surveillance systems monitor. Therefore, the ALJ concluded that plaintiff was not disabled.

## D. ANALYSIS

Plaintiff raises three issues in her motion and argues that each one supports reversal of the Commissioner's decision and remand for either calculation of benefits, or, in the alternative, for the ALJ to apply the proper legal standards to reach a correct determination. The three issues are: (1) the ALJ improperly relied on vocational expert testimony, which did not provide substantial evidence to support the denial of benefits; (2) the ALJ failed to properly assess plaintiff's credibility and arrive at a proper residual functional capacity determination; and (3) the ALJ failed to find that plaintiff met the listing criteria in Appendix I, Subpart P, Sec. 9.08(A). The Court agrees with plaintiff on each of these three points and finds that the ALJ's decision is not supported by substantial evidence with respect to each of these issues.

### 1. Listing Criteria

There is substantial evidence in the record that the claimant meets the listings criteria, which are, in pertinent part:

9.08 Diabetes Mellitus. With: A. Neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station. . . .

Appendix I, Subpart P § 9.08(A), Regulation No. 4.

Dr. Russell Woglom, plaintiff's treating physician, found the following: decreased dexterity and strength of her hands; muscle wasting and facilation of the muscles; decreased vibratory sensation and decreased light touch in the left leg; definite wasting of intrinsic muscles of the hands, right more than left; proximal strength weakening; weakness in the left leg and wasting 2 cm. at the calf, 2–4 cm. at the thigh; positive Babinski on the left and no response on the right; slightly spastic gait; positive nerve conduction studies indicating polyneuropathy related to diabetes; inability to grasp and/or hold onto objects; need for frequent resting of hands upon use; inability to work repeatedly with hand tools or small objects; and repetitive use of hands will exacerbate her pain. Additionally, Dr. Woglom opined that she met the listings criteria of § 9.08(A) as set forth in his medical evaluation report dated May 25, 1996. Moreover, it was his opinion that plaintiff had significant and persistent disorganization of motor function in her hands.

The ALJ's decision contains no significant discussion of the listings criteria and whether the evidence is sufficient to show that plaintiff met them. He simply states, in conclusory fashion, that "the medical evidence establishes that ... [plaintiff] does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations [sic.] No. 4." R. at 20. The ALJ's opinion does not further address this issue.

■ Under the regulations, the ALJ's determination as to whether the claimant's impairment meets or equals the Listings must reflect a comparison of the symptoms, signs, and laboratory findings about the impairment, as shown in the medical evidence, with the medical criteria as shown with the listed impairment. See 20 CFR § 404.1526. Where the claimant's symptoms, as described by the medical evidence, appear to match those described in the Listings, the ALJ must provide an explanation as to why the claimant failed to meet or equal the Listings. Costanzo v. Apfel, No. 98–CV–606H, 2000 WL 575660 at *3, 2000 U.S. Dist. LEXIS 6715, *6–*7, 68 Soc. Security Reporting Service 561 (W.D.N.Y. Feb. 8, 2000); See also Morgan on Behalf of Morgan v. Chater, 913 F.Supp. 184, 189 (W.D.N.Y.1996) ("There is no discussion as to why [the ALJ] made this determination, what evidence he relied upon, and what evidence he rejected in making such a finding. This one sentence denial is insufficient to support the determination, especially in light of the considerable evidence to the contrary"). In addition, the Commissioner's rulings provide that,

When a treating source provides medical evidence that demonstrates that an individual has an impairment that meets the listing, and the treating source offers an opinion that is consistent with the evidence, the adjudicator's administrative finding about whether the individual's impairments meets the requirements of the listing will generally agree with the treating source's opinion.

SSR 96–5p.

■ The ALJ obviously failed to apply the proper legal standard in weighing the evidence as it relates to this issue and has failed to articulate any reason for rejecting the treating source's opinion. In fact, there is no indication whether he gave any consideration to the treating source's assessment on this issue.

### 2. Vocational Expert Testimony

■ Where, as here, a claimant's application is denied at the fifth step of the

sequential evaluation, it is the Commissioner's burden to prove that the claimant is not disabled. *Rosa v. Callahan,* 168 F.3d 72 (2d Cir.1999); *Pratts v. Chater,* 94 F.3d 34 (2d Cir.1996); *Perez v. Chater,* 77 F.3d 41 (2d Cir.1996). At the fifth step of the sequential evaluation, it is improper to determine that the claimant could do other work without evidence that such work exists in the national economy in significant numbers. The "significant numbers" test requires that the jobs exist "in significant numbers either in the region where you live or in several other regions of the country." 20 C.F.R. § 404.1566(a). A vocational expert should identify specific existing occupations that would be suitable for the claimant and clarify the nature of the job openings to ensure that they do not require skills or exertion not possessed by the claimant. *See Brady v. Bowen,* No. 83 Civ. 6236(MGC), 1987 WL 5809, 1987 U.S. Dist. LEXIS 178 (S.D.N.Y. Jan.16, 1987).

Here, the ALJ found that plaintiff retained the residual functional capacity to perform sedentary work, not involving fine manipulation. The ALJ, relying upon VE testimony in response to a hypothetical with this limitation, found that plaintiff could perform certain cashier jobs and the job of surveillance system monitor. Even assuming that the residual functional capacity arrived at by the ALJ is correct, the VE's testimony does not provide substantial evidence to support the ALJ's ultimate conclusion as required at the fifth step of the sequential evaluation. The VE stated that plaintiff's past relevant work was light and unskilled. Based upon this hypothetical, the VE was of the opinion that plaintiff could not perform her past relevant work because of the standing involved. However, the VE concluded that two jobs, that of a cashier involving no lifting, and surveillance system monitor, were ones plaintiff could perform. The Court will evaluate each.

### a. Cashier

Examples of cashier jobs which the VE thought that plaintiff could perform included: tollbooths, parking ramps and garages, off-track betting, theaters and sports arenas. He identified these jobs in the Dictionary of Occupational Titles ("DOT") as "211.462 and ensuing." R. at 168. The expert testified that there were approximately 100,000 jobs out of a total 2.5 million that did not require lifting. However, the VE's testimony lacks evidentiary support for his conclusion that plaintiff could work as a cashier.

The VE admitted that all of the cashier jobs included in the 100,000 figure required repetitive manipulation of coins to make change. In that regard, the VE did not consider making change to be "fine manipulation"; rather, he testified that it was "more a gross manipulative type movement." R. at 177. This was simply his own opinion and was not based upon any working definition. On examination by plaintiff's counsel, he agreed that working with your fingers with small objects would be considered fine manipulation, but did not consider a penny to be a small object. R. at 168. The VE cited the job of toll collector, DOT No. 211.462.038, as one of the cashier jobs included in his 100,000 jobs figure. The toll collector job is further described in the Enhanced Guide for Occupational Exploration ("EGOE") at No. 07.03.01. The EGOE was used by the VE as a source of vocational information. The EGOE classifies this job as "light," requiring "fingering" occasionally (up to 1/3 of the time) and a finger dexterity aptitude in the middle 33% of the population, which the VE felt required average manipulative skills. He also agreed that these requirements for fingering and finger dexterity applied to

all the cashier jobs that he had cited within the 100,000 jobs figure.

"Fingering" is defined in the EGOE as: "picking, pinching, or otherwise working primarily with fingers rather than with the whole hand or arm as in handling." The finger dexterity aptitude required for this job is defined as "moving fingers and working with small things quickly and accurately." On the definition of fine manipulation, the VE testified,

> Q. Do you have a, a definition that you use for fine manipulation rather than specific job [*sic.*]?
> A. It's my own. No, it's my own—
> Q. Just your own opinion?
> A. —my own opinion. It's my opinion.
> Q. What—having to work with your fingers with your fingers with small objects, would you consider that to be fine manipulation?
> A. Yes, small, small—real small objects, screws—
> Q. Well, would a penny be considered a small object?
> A. I don't consider—

R. at 178. The definition used by the VE in concluding that the cashier jobs upon which he was relying do not require fine manipulation is at odds with the authoritative vocational information and common usage of the term. Testimony from the VE which conflicts with the DOT fails to demonstrate the existence ·of substantial gainful employment which the claimant is capable of performing. *See Mimms v. Heckler,* 750 F.2d 180, 186 (2d Cir.1984).

Moreover, several of the cashier jobs in the category testified to by the VE are classified as "light" work, not sedentary work. The VE testified that the cashier jobs included in his 100,000 figure are identified in the DOT as "211.462 and ensuing." R. at 168. The cashier jobs listed on Page 184 of the DOT, including that of toll collector, have a strength rating of "light." "Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing—the primary difference between sedentary and most light jobs. . . . Relatively few unskilled light jobs are performed in a seated position." SSR 83–10, glossary. Although the VE testified that these cashier jobs did not require lifting, he did not address the necessity for standing and walking required by light work. The VE testified that plaintiff could not perform her past relevant work, which he classified as light, due to the standing involved. R. at 165. The VE provided no information which would indicate that plaintiff was capable of performing the standing requirements of light work given that the hypothetical limited plaintiff to sedentary work. *See Gallant v. Massanari,* 2001 WL 912406 (D.Maine 2001).

Further, several of the cashier jobs in the category testified to by the VE are classified as "semiskilled." For example, the job of cashier checker, DOT No. 211.462–014, has a specific vocational preparation number of "3" requiring up to 3 months of training. This is classified as semiskilled[8] work. *See* SSR OO–4p. The VE testified that plaintiff's prior work involved only unskilled work. Clearly, plaintiff can not obtain transferable skills from unskilled work. *See* SSR 00–4p and SSR 82–41.

■ Also, the VE testimony required the ALJ to speculate as to the number of

---

8. "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1–2; semi-skilled work corresponds to an SVP of 3–4; and skilled work corresponds to an SVP of 5–9 in the DOT." SSR 00–4p.

jobs available as cashier. The VE testified that in the national economy there are 100,000 cashier jobs that did not require any lifting. When asked to elaborate as to how he arrived at that figure, the VE testified that he had a conversation with an unidentified person at the Bureau of Labor Statistics, who agreed with him that 4% to 5% of the total 2.5 million jobs would be a satisfactory representation of cashier jobs without lifting. He could not testify to the reasonableness of that figure, but simply was relying upon what this unidentified person told him. Additionally, given that several of the cashier jobs included in the 100,000 figure are light, semiskilled, and require fine manipulation, the Court cannot find that substantial evidence supports the ALJ's determination that the Commissioner met her burden of proof with regard to whether significant numbers of cashier jobs existed in the economy which plaintiff was capable of performing.

### b. *Surveillance System Monitor*

The VE testified that plaintiff could work as a surveillance system monitor, of which there were 20,000 non-governmental jobs in the national economy. As he correctly indicated, the DOT description for surveillance system monitor, DOT No. 379.367–010, is a governmental position found only in transportation. The DOT classifies this job as an unskilled sedentary job.

■ However, the VE testified about surveillance system monitors working in gambling casinos, which is not listed in the DOT. When asked whether this particular job was an entry level position, the VE responded that it required less than 6 weeks training. This ambiguous response left open the possibility that training was required for more than 30 days, indicating

a semiskilled position. This is certainly reasonable given that the job cited involved gambling casinos, which would require training as to the different games and ways in which gamblers cheat. As previously indicated, the VE specifically testified that the claimant's past relevant work was unskilled and she would not, therefore, have any skills which were transferable to this type of work.

Additionally, the EGOE indicates that the job of a surveillance system monitor requires an aptitude for both finger dexterity and manual dexterity in the lower 33%. Although, this indicates a below average degree of the aptitude, nonetheless, there must exist some degree of the aptitude in order to perform the job. As the hypothetical given to the VE assumes that plaintiff could do no fine manipulation (*i.e.*, no aptitude for fingering), it is apparent that the claimant could not perform this particular job.

Even if the VE's testimony could be taken at face value that plaintiff could perform the job of surveillance system monitor, plaintiff would still be entitled to a finding of disability. SSR 96–9p states that a finding of "disabled" usually applies when the full range of sedentary work is significantly eroded. The existence of only one unskilled sedentary job, *i.e.* surveillance system monitor, indicates that the full range of sedentary work is significantly eroded. Under similar circumstances, the Appeals Council has awarded benefits. In the *Davis* [9] claim, the VE testified that the only jobs that the claimant could do were that of cashier and surveillance system monitor. The Appeals Council noted that the job of cashier required frequent handling and reaching which exceeded the claimant's residual functional capacity as stated in the hypothetical. By eliminating these jobs, the occupational base was sig-

---

9. Plaintiff attached a copy of this decision to her memorandum of law.

nificantly eroded to the point where there were no jobs existing in significant numbers in the national economy which the claimant could do. The circumstances here are markedly similar.

### 3. *Plaintiff's Credibility as it Pertained to the ALJ's Residual Functional Capacity Finding*

 The ALJ erred in his finding that plaintiff's complaints of pain "so significant as to preclude sedentary work not involving fine manipulation . . . are not credible." R. at 20. The ALJ's decision does not address the opinion of Dr. Russell Woglom, plaintiff's treating physician, that her condition met the requirements of Appendix I, Subpart P § 9.08(A) of Regulations No. 4, and the ALJ's conclusion that plaintiff experiences no significant pain is not supported by substantial evidence in the record.

Plaintiff gave extensive testimony concerning the difficulties that she has with her high and low blood sugars and the symptoms which result, including: blurred vision, confusion, loss of concentration and nausea. The ALJ undertook no meaningful discussion concerning these limitations and plaintiff's credibility. In this regard, plaintiff was diagnosed as a "brittle diabetic" by Dr. Woglom. This term is used for "insulin dependent diabetes, especially that characterized by wide, unpredictable fluctuations of blood glucose values and, therefore, difficult to control." Dorland's Illustrated Medical Dictionary (28th ed., 1994), at 456. This diagnosis supports plaintiff's complaints.

The ALJ found that plaintiff's other allegations concerning her disability were not credible for three reasons: (1) she did not allege actual pain, but described her symptoms as "cramping"; (2) she partakes in significant activities of daily living; and (3) the only medications she was taking were

Motrin and Alleve. The reasons cited by the ALJ do not provide substantial evidence to reject plaintiff's credibility.

The finding that plaintiff did not allege actual pain but simply "cramping" is an inaccurate representation of the record. At the hearing plaintiff clearly testified that her cramping was accompanied by stiffness and pain. When her hands cramped she would attempt to smooth her hands out and it would be approximately five or ten minutes before the pain would dissipate. Her testimony is also supported by the medical records. For instance, on July 8, 1992, she complained of her hands feeling numb and her fingers tingling. R. at 448. She complained on July 24, 1992, of increasing difficulty with her left hand and achiness around the left wrist and tingling in the fingers. This was accompanied by muscle wasting. R. at 370. Dr. Woglom indicated that her condition could be expected to produce pain and that her complaints of pain were consistent with his diagnosis. R. at 388. Furthermore, a cramp is, by definition, painful. A "cramp" is medically defined as "a painful spasmodic muscular contraction, especially a tonic spasm." Dorland's Illustrated Medical Dictionary (28th ed.1994), at 389. Further, whether or not the cramping was accompanied by pain, it most certainly interfered with her ability to use her hands.

 Although plaintiff testified that she did engage in some of the activities of daily living mentioned by the ALJ in his decision, the ALJ fails to note the limited fashion in which she undertook these activities. For instance, she testified that she was able to do some housework, but she had trouble doing it and always had help. R. at 146–59. She also testified that she took frequent breaks, for example, sweeping for five to ten minutes and breaking for twenty minutes. R. at 160. She stated she needed help with the shopping, did

some cooking, but had trouble grasping cans, opening tops and using a can opener. R. at 146. The ALJ's reference to plaintiff's daily activities was selective in that it did not consider the limited basis on which plaintiff performed these activities and, even then, frequently with help. The ALJ cannot pick and choose only that portion of the evidence that supports his conclusions. *Morgan v. Chater,* 913 F.Supp. 184 (W.D.N.Y.1996). Pursuant to *Rivera v. Schweiker,* 717 F.2d 719, 725 (2d Cir.1983), plaintiff's subjective complaints are entitled to great weight when accompanied by objective medical evidence. The Court finds that plaintiff's complaints are amply supported by the objective medical evidence of severe polyneuropathy.

 The Court also finds that the ALJ incorrectly failed to weigh the evidence of the independent witnesses, Peggy Mapes and Diana Dillon. The testimony of lay witnesses may be entitled to great weight if uncontradicted in the record. *Maisch v. Heckler,* 606 F.Supp. 982, 991 (S.D.N.Y.1985). The ALJ is required to consider evidence of pain and physical incapacity from those who have observed plaintiff. *Carroll v. Health and Human Services,* 705 F.2d 638, 642 (2d Cir.1983). "The ALJ's failure to acknowledge relevant evidence or to explain its implicit rejection is plain error." *Pagan v. Chater,* 923 F.Supp. 547, 556 (S.D.N.Y.1996). Because plaintiff's testimony on her physical and mental limitations is highly relevant to the ALJ's determination of her residual functional capacity, the ALJ's evaluation of this testimony should be free from error. *Castillo v. Apfel,* 1999 WL 147748 at *8 (S.D.N.Y.1999) ("The plaintiff's testimony on his ability to sit and stand and the measures he uses to relieve pain is highly relevant to the ALJ's determination of the plaintiff's residual functional capacity and

thus the ALJ's evaluation of this testimony should be free from error").

As the result of the ALJ's improper credibility assessment, he has failed to include in his RFC determination the mental limitations arising from plaintiff's fluctuations in blood sugar levels. Further, as a result, the ALJ relied on an inadequate hypothetical proposed to the VE, which did not include the mental limitations. It is well settled that

[I]n order to rely on a vocational expert's opinion:

"the hypothetical question posed to a vocational expert must fully set forth a claimant's impairments." *Totz v. Sullivan,* 961 F.2d 727, 730 (8th Cir. 1992) (citing *Shelltrack v. Sullivan,* 938 F.2d 894, 898 (8th Cir.1991)). If a hypothetical question does not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability.

*Morse v. Shalala,* 16 F.3d 865, 874 (8th Cir.1994) (emphasis added). In fact, when posed a hypothetical by plaintiff's counsel, which included no repetitive fine manipulation, periods of loss of concentration, blurred vision, fatigue and mental confusion for forty-five minutes to two hours up to eighteen times per month during work hours, the VE responded that these limitations would preclude all forms of substantial gainful activity. R. at 182–83; *see also* R. at 455 (report of Gordon Sharpless, M.S. C.R.C.)

### VI. CONCLUSION

Thus, in light of the above, the Court finds that the ALJ's decision is not supported by substantial evidence and the Commissioner's decision must be reversed and remanded. In light of the history of

this case, including two previous remands and three hearings before two different ALJ's, and because of the evidence presented in the record provides persuasive proof of disability, the Court determines that a remand for a new hearing would serve no useful purpose. Therefore, the Court reverses and remands solely for the calculation and payment of benefits. *See Parker v. Harris*, 626 F.2d 225, 231 (2d Cir.1980). Accordingly, the Commissioner's motion for judgment on the pleadings (document # 9) is denied and plaintiff's motion for judgment on the pleadings (document # 5) is granted. The Commissioner's decision is reversed, and the case is remanded for calculation and payment of benefits.

It Is So Ordered.