Ramon REYES, Plaintiff,

v.

Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.

No. 01 CIV. 1724(JGK).

United States District Court,
S.D. New York.

Oct. 10, 2002.

Charles E. Binder, Binder and Binder,
New York City, for Plaintiff.

Susan D. Baird, Susan D. Baird, Asst. U.S. Atty., United States Attorney, New York City, for Defendant.

## *OPINION AND ORDER*

KOELTL, District Judge.

The plaintiff, Ramon Reyes, brings this action pursuant to 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security (the "Commissioner"), denying his claim for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The parties have filed cross-motions for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). The plaintiff has also moved, in the alternative, that the case be remanded to the administrative agency for a new hearing.

The Commissioner's motion seeks to affirm the Commissioner's decision on the grounds that the decision of the Administrative Law Judge ("ALJ") denying benefits is supported by substantial evidence. The plaintiff has moved to reverse and remand on two grounds: first, that the ALJ erred as a matter of law in not giving appropriate weight to the opinions of a treating physician and for failing to provide good reasons for rejecting them; and second, that the new evidence submitted by the plaintiff after the ALJ's decision undermines the ALJ's decision such that it is not supported by substantial evidence.

### I.

The plaintiff filed an application for DIB and SSI benefits on October 4, 1996, (R. 116–119.), which was initially denied. (R. 88, 93–96.) The plaintiff reported that his disabling condition was "severe asthma and high blood pressure." (R. 116.) He then filed a timely request for reconsideration which was denied on April 3, 1997. (R. 89–90, 97–105). On May 28, 1997, the plaintiff filed a request for a hearing by an administrative law judge. (R. at 106.) A hearing was held on May 27, 1998. (R. 108–112.) At the hearing, the plaintiff was represented by counsel and the plaintiff testified that asthma, high blood pressure, and back pain prevented him from working. (R. 75–78.)

After listening to the sworn testimony of the plaintiff and reviewing all of the medical records that were submitted, Administrative Law Judge Joseph K. Rowe (the "ALJ") determined that the plaintiff was not entitled to DIB or SSI benefits because he "was not under a 'disability' as defined in the Social Security Act, at any time through the date of the decision [September 30, 1998]." (R. 65.) The ALJ found that the plaintiff had not engaged in substantial gainful activity since October 15, 1995. (*Id.*) The ALJ found that the medical evidence established that the claimant had severe asthma, hypertension and lower back pain syndrome, but found that "his subjective complaint of totally disabling pain and discomfort" was not fully credible. (*Id.*) Additionally, the ALJ found that the claimant had the residual functional capacity to conduct work-related activity, except where the work involved frequent lifting and carrying of weight greater than 50 pounds. (*Id.*) Finally, the ALJ found that the plaintiff's impairments did not prevent him from performing his past work as a leather cutter. (*Id.*) The plaintiff sought review of the ALJ's decision, and also submitted additional evidence for evaluation in such a review. (R. 10,13.) The Appeals Council denied the plaintiff's request for review on January 4, 2001, and the ALJ's decision became the final decision of the Commissioner. (R. 7–9.) This appeal followed.

### II.

The administrative record reveals the following facts. The plaintiff, Ramon Reyes, was born on August 5, 1947, in the

Dominican Republic. (R. 72.) He came to the United States in 1976, after having completed schooling through the eighth grade. (R. 72–73.). The plaintiff speaks no English. (R. 72–73).

After coming to the United States, and until October, 1995, the plaintiff worked as a leather cutter in a factory, a job that required cutting pieces of leather with razor blades while standing. (R. 73–74.) After the factory shut down, and after receiving unemployment benefits, the plaintiff ceased looking for a new job, because he found that he could not continue working due to various medical ailments. (R. 75.)

The plaintiff first applied for DIB and SSI benefits on October 4, 1996. (R. 116–119.) He reported his disability as asthma and high blood pressure. (R. 116.) At the hearing before the ALJ, the plaintiff testified that he was suffering from symptoms of asthma, high blood pressure, and a back impairment. (R. 75.) He testified that he had asthma for over fifteen years, but that it had worsened over time, and prevented him from sleeping for more than an hour or two per night. (R. 75–76, 84.) The plaintiff had been taking medication to help control his asthma. (R. 76.) He testified that he had back pain for three to four years, for which he was using a back brace and also taking medication. (R. 76.) Finally, he noted that he had been suffering from high blood pressure for over fifteen years, and had been taking medication. (R. 77.) He also testified that he believed that the high blood pressure had been worsening, because he had recently been suffering from headaches and dizziness on a daily basis. (R. 85.)

The plaintiff reported that these medical conditions had impaired many of his daily activities. The combination of the plaintiff's symptoms limited his ability to stand for more than two or three hours without having to sit down, and prevented him from bending down or from lifting, carrying or pushing any weight. (R. 82–83.)

A review of the plaintiff's medical records show that on June 28, 1996 the plaintiff presented himself to Dr. Baez of the Renaissance Health Care Network for an examination regarding his asthma, hypertension and chest pains. (R. 235.) Dr. Baez found degenerative joint disease of the lumbo-sacral spine, knees and wrists, for which he prescribed Tylenol. (R. 145; 235.)

The plaintiff also visited Dr. Baez on several other occasions, when Dr. Baez took the plaintiff's blood pressure and prescribed anti-hypertensive medication. (R.231–236.) A July 12, 1996 visit revealed high blood pressure and medication was prescribed. (R. 143.) An X–Ray of the spine was taken at this time, which revealed changes of the spine at the C5, C6, and C7 levels. (R. 150, 200, 256.) X–Rays of the wrists, hands, and knees revealed no abnormalities and were negative for arthropathy. (R. 150.) An August 28, 1996 visit led Dr. Baez to increase the plaintiff's hypertension medication, and he also found that the plaintiff's asthma was stable and asymptomatic. (R. 141, 197, 232.)

Dr. Sanae Inagami, the plaintiff's regular physician, also evaluated the plaintiff on multiple occasions, and submitted her findings from those evaluations in a formal report to the State disability agency. That report contained the following findings. A June 19, 1998 examination of the plaintiff revealed spondylolysis of the lumbar spine. (R. 275.) This conclusion was based upon a CT scan, as well as observing that the plaintiff had an inability to put weight on his right leg, had weak flexor and extension, and had sensory loss in the right leg, although his reflexes were intact. (R. 275.) Dr. Inagami also noted that the plaintiff had been taking medication for back pain, and that he required spinal

fusion, but had not been able to afford the surgery. (R. 275.) Dr. Inagami also diagnosed asthma and hypertension. (R. 275.) Finally, Dr. Inagami concluded that the plaintiff could recover only if he obtained surgery. (R. 276.)

As part of the report submitted to the disability agency, the Dr. Inagami included her June 19, 1998 Residual Functional Capacity Form ("RFCF"). (R. 209–10.) In this RFCF she estimated that during the course of an eight hour day, the plaintiff could sit for up to four hours, and could stand or walk up to two hours. Additionally, she noted that he cannot push or pull with either the upper or lower extremity, and that he cannot lift any weight. The RFCF recommended that the plaintiff avoid unprotected heights, moving machinery, marked humidity or temperature changes, driving, exposure to dust, and exposure to gases. (R. 209–10.) She also noted that the plaintiff's medication did not cause him any side effects. (R. 210.)

On January 31, 1997, the plaintiff was sent by the Social Security Administration for an examination by Dr. Peter E. Graham. (R. 160–63.) An examination of his lumbar spine revealed a full range of motion, and no muscle spasm or tenderness. (R. 161.). The plaintiff was able to raise his leg a full ninety degrees bilaterally, and he had muscle strength that was commensurate with his build. (R. 161.) Dr. Graham also examined the plaintiff's breathing, finding that the results of various tests were consistent with restrictive and obstructive lung disease, but that the plaintiff had normal breath sounds and did not exhibit any wheezing, rales or rhonchi. (R. 161, 162.) Dr. Graham also conducted pulmonary function testing, an EKG, and chest x-rays. (R. 161, 163–66.) From these tests and his observations of the plaintiff, Dr. Graham came to the following conclusions: the plaintiff had (1) asthma by history, but did not have clinical bron-

chospasm; (2) hypertension, poorly controlled; (3)back pain by history, but did not have any present functional deficit; (4) mild bipedal edema; and (5)no restrictions on his ability to sit, stand, walk, carry or handle objects, hear and speak, or travel. (R. at 162.)

Dr. Pelligrino, a state medical consultant, conducted a review of the plaintiff's medical records, and on February 11, 1997 concluded that the plaintiff could lift twenty-five pounds, occasionally lift fifty, and that the plaintiff could sit, stand and walk for up to six hours of a normal eight hour workday. (R. 170–77.) These conclusions were reviewed by Dr. Reynolds, another state medical consultant, who concurred in the assessments of the plaintiff's records. (R. 177.)

After the decision of the ALJ was issued, the plaintiff submitted additional evidence to the Appeals Council concerning the plaintiff's condition during the period October 1998 through July 2000. This additional evidence included the following additional reports, assessments and tests.

An October 15, 1998 assessment by Dr. Inagami found that the plaintiff suffered from sciatia and lower back pain, along with episodic acute asthma that resulted in attacks twice a year, which were moderate to severe. (R. 261–62.) Dr. Inagami found that these asthma attacks were precipitated by exposure to irritants, allergens, changes in weather, and upper respiratory infections. (*Id.*) The report also noted that the plaintiff could only walk one block without rest, and could sit and stand continuously for only thirty minutes at a time. (R. 263.) The report also advised that the plaintiff could never lift and carry weight, and cautioned that he was to avoid all temperature extremes, fumes, odors, dusts, gases, perfumes, solvents, cleaners, and other environmental irritants. (R. 264.) Finally, the plaintiff was expected to

be absent from any work a minimum of three times a months, due to his impairments or treatment. (*Id.*)

A November 9, 1998 CT scan of the lumbar spine ordered by Dr. Inagami showed degenerative changes at the L4–L5 level, and indicated possible spondylolysis but no herniation. (R. 274.) A neurology consultation was ordered, and subsequently, the plaintiff was examined by a neurologist on December 11, 1998. (R. 280.) This examination showed mild decreases in deep tendon reflexes, a mildly decreased ankle jerk, and an ability to raise his leg up to seventy-five degrees. (*Id.*) The neurologist recommended an MRI scan. (R. 280).

Dr. Inagami completed a Physical Functional Capacity Assessment form after an August 16, 1999 examination. She diagnosed the plaintiff as having symptoms consistent with stensosi and spondylolysis, noting that these conditions cause chronic back pain. (R. 46–47.) Finally, Dr. Inagami rendered an opinion regarding the plaintiff's ability to function in a work environment and his ability to sit and stand during an eight hour day. These conclusions were similar to her earlier conclusions regarding the plaintiff. (R. 49–52.)

Additional assessment forms were dated and submitted on July 26 and 27, 2000. The July 26 report indicates that the plaintiff suffered from severe depression and had attempted suicide. (R. 22.) The July 27 report noted that the plaintiff had been seen by the Renaissance Health's psychiatry department, which had diagnosed him with · a severe major depressive episode and had noted his back pain and sever asthma. (R. 14.) This report also rated his depression as a "ten" on a scale of one to ten; his back pain at eight; and his fatigue as a six. (R. 16.)

The plaintiff also submitted, as part of the supplemental submission, a report by Dr. Joseph Francis De Feo, an orthopedic surgeon, dated August 8, 1999. His report detailed additional findings, based on various clinical exams, CT scans, an MRI, and his observations of the plaintiff. Dr. De Feo concluded the following: that the plaintiff (1) has multilevel arthrosis, including the cervical and lumbo-sacral spine, and both knees and ankles; (2) is limited in his ability to sit, stand, or walk for any extended period of time; (3) had symptoms and conditions that would preclude him from engaging in any gainful employment; and (4) had a physical disability that is total and permanent. (R. 36–37.)

### III.

The analytical framework for evaluating claims of disability is defined by regulations of the Commissioner, which set forth a five-step inquiry. *See* 20 C.F.R. § 404.1520 (evaluation of disability for DIB); *see also* 20 C.F.R. § 416.920 (same evaluation of disability for SSI benefits). The Court of Appeals for the Second Circuit has described this five-step process as follows:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical capacity to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then

asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir.2000) (internal citation omitted); *see also Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir.1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir.1998); *Dixon v. Shalala*, 54 F.3d 1019, 1022 (2d Cir.1995). The claimant bears the initial burden of proving that the claimant is disabled within the meaning of the Act. *See* 42 U.S.C. § 423(d)(5); *see also Shaw*, 221 F.3d at 132; *Maier v. Chater*, No. 95 Civ. 9264, 1997 WL 570938, at *3 (S.D.N.Y. Sept. 5, 1997); *Agovino v. Chater*, No 94 Civ. 8740, 1997 WL 153829, at *3 (S.D.N.Y. April 2, 1997); *Reyes v. Sec'y of Health and Human Services*, 807 F.Supp. 293, 298 (S.D.N.Y.1992). This burden encompasses the first four steps described above. *See Rivera v. Schweiker*, 717 F.2d 719, 722 (2d Cir.1983). If the claimant satisfies the burden of proof through the fourth step, the claimant has established a prima facie case and the burden shifts to the Commissioner to prove the fifth step. *See id.* at 722–23; *see also Medina v. Apfel*, No. 00 Civ. 3940, 2001 WL 1488284, at *2–3 (S.D.N.Y. Nov. 21, 2001); *Infante v. Apfel*, No. 97 Civ. 7689, 2001 WL 536930, at *4 (S.D.N.Y. May 21, 2001) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982)).

A court may set aside, and reverse, a determination by the Commissioner only if it is based on legal error or is not supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *Berry*, 675 F.2d at 467. Substantial evidence is "more

that a mere scintilla," it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see also Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir.1995); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir.1991).

In this case, the plaintiff contends that the ALJ committed legal error by failing to comply with the Commissioner's regulations concerning the evaluation of reports by treating physicians. The plaintiff also contends that the Commissioner's determination is not supported by substantial evidence in the record, given that the evidence submitted by the plaintiff after the ALJ's determination was not adequately considered.

### A.

█ The Commissioner's regulations require that greater weight be given to the opinion of a treating physician than a non-treating physician, especially where the non-treating physicians's examination is for the purposes of the disability proceeding itself. *See Schisler v. Sullivan*, 3 F.3d 563, 567–68 (2d Cir.1993). These regulations state, in pertinent part:

Generally we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone, or from reports of individual examinations, such as consultative examinations. [A] treating source's opinion on the .. nature and severity of [the] impairment(s) [that] is well-supported by medically ac-

ceptable clinical and laboratory diagnostic techniques and ... not inconsistent with the other substantial evidence ... will [be given] controlling weight. When we do not give the treating source's opinion controlling weight, we apply [various] factors ... in determining the weight to give the opinion. We will always give good reasons ... for the weight [given to the] treating source's opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The factors used to determine the weight of a treating source's opinion when it is not given controlling weight include:

(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion, i.e. "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; if it is, it will be accorded greater weight; and (v) other relevant but unspecified factors.

*Schisler*, 3 F.3d at 567; 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6).

■ Here the ALJ did not give controlling weight to the treating physician's opinion. The ALJ, in summary fashion concluded, "Dr. Inagami's physical capacity assessment is not found by me to be supported by his own reported clinical findings, inconsistent with those reported by the consulting examiner and not given great weight." (R. 64.) This is the only reference in the ALJ's decision as to why he rejected Dr. Inagami's findings and conclusions. Dr. Inagami, after multiple examinations and tests of the plaintiff, found that the plaintiff could not place any weight on his right leg, that he was suffering sensory loss in his right leg, and that, as a result, he could only stand or walk for up to two hours and that he could only sit for no more than four hours in an eight hour day. (R. 275; 209–10.) Additionally, she specifically noted that the plaintiff could only recover from his deteriorating back condition if he obtained surgery. (R. 276.) This back condition, along with his other symptoms, prevented him from pushing or pulling with either extremity, or from lifting any weight. (R. 209–10.) Dr. Inagami concluded that the plaintiff was to avoid the environmental hazards that were present in his prior line of work. (*Id.*) These findings would have precluded the ALJ's conclusion that the plaintiff had the capacity to perform his past relevant work as a leather cutter. Contrary to the bare assertion of the ALJ, Dr. Inagami's conclusions were based upon, and entirely consistent with the clinical tests, CT scans, X-rays, and other exams of the plaintiff. (*See* R. 275–76.)

Under the Regulations, the ALJ was required to give some weight to these conclusions of the plaintiff's regular treating doctor, even if they were not given controlling weight in view of other medical evidence in the record. However, the ALJ was also required to articulate the weight that he gave to the treating doctor's conclusions and to give good reasons for that weight. *Schisler*, 3 F.3d at 567. The ALJ failed to do so. While the ALJ said that Dr. Inagami's conclusions were inconsistent with his own tests, that was not accurate. While the ALJ said that Dr. Inagami's conclusions were at odds with those of the State agency's doctors, that would not be a dispositive reason for affording Dr. Inagami's conclusions no weight in view of the greater deference that should be accorded to the opinions of a regular treating doctor. This is not the rigorous and detailed analysis required under *Schisler*. The ALJ failed specifically to refer to any of the tests or reports submitted by Dr. Inagami, or indicate why the State agency

doctor's reports were more credible that those of Dr. Inagami.

Under the Commissioner's regulations, Dr. Inagami's opinions were entitled to substantial weight, even if not controlling weight, and the failure of the ALJ to give "good reasons" for failing to give those opinions any weight was legal error. In this case, Dr. Inagami was the plaintiff's primary doctor and had evaluated the plaintiff for an extended period of time. Given this length of treatment, and given that clinical evidence supported her conclusions, Dr. Inagami's conclusions were to be accorded substantial weight by the ALJ. By failing to give any weight to Dr. Inagami's opinions and by failing to provide "good reasons" for doing so, the ALJ committed legal error, and the decision of the Commissioner should be reversed.

### B.

The Commissioner's decision should also be reversed and remanded because the decision is not supported by substantial evidence. The evidence submitted after the ALJ's decision, and prior to the Commissioner's final decision, seriously undermines the conclusion that the plaintiff is not disabled and not entitled to DIB and SSI benefits.

Under the Commissioner's regulations, a claimant is entitled to submit new evidence to the Appeals Council, provided that it is "new" and "material." The Appeals Council is required to consider that evidence only where it relates to the period on or before the date of the ALJ hearing decision. 20 C.F.R. § § 404.970(b); 416.1470(b). That evidence then becomes part of the administrative record that the court considers in determining whether there is substantial evidence to support the Commissioner's decision. *See Perez v. Chater,* 77 F.3d 41, 45–46 (2d Cir.1996). In this case, the ALJ's decision was issued on September 30, 1998. Therefore, the

issue becomes whether the additional medical information related to the period prior to September 30, 1998 such that the Commissioner's decision finding the plaintiff not to be disabled as of that date could not be found to be supported by substantial evidence.

The Appeals Council determined that the additional submissions by Dr. Inagami and the submissions of Dr. De Feo were not material to the issue of whether the plaintiff was disabled on or before September 30, 1998, the date of the ALJ's decision. (R. 8.) The Appeals Council directed the plaintiff to file a new application for benefits if he wished to receive benefits on the basis of disability developed after September 30, 1998. (*Id.*)

However, subsequent medical evidence that supports the disabling nature of the medical conditions in the relevant time period can be material. *See,e.g., Lane v. Apfel,* No. 98 Civ.2068, 2000 WL 1118921, at *9 (S.D.N.Y. Aug. 8, 2000).

In this case the severity of the conditions in the period shortly after the relevant time period lends strong support to Dr. Inagami's conclusion that the very same conditions were disabling in the relevant time period.

Dr. Inagami's subsequent submissions indicate that the plaintiff's asthma attacks were now characterized as moderate to severe. (R. 261–62.) The plaintiff was diagnosed with sciatica and low back pain. (R. 261.) The plaintiff's maximum time for continuous sitting or standing had been reduced from two hours to a mere thirty minutes. (R. 263.) Dr. Inagami's first report reflecting these findings was issued less than three weeks after the ALJ's decision. (R. 265.) A CT scan conducted in November, 1998 revealed that the plaintiff's back and spinal conditions had deteriorated. (R. 274.) Ultimately, the plaintiff's back pain was at the high

end of Dr. Inagami's scale of severity. (R. 16.)

Moreover, the Dr. De Feo's findings in August, 1999 support Dr. Inagami's findings. Dr. De Feo, after conducting a series of tests, found the plaintiff had a very limited ability to sit, stand or walk continuously for any extended period of time. (R. 36–37.) Additionally, Dr. De Feo concluded that the plaintiff has a total and permanent disability that made it impossible for him to engage in any gainful employment. (*Id.*) Dr. De Feo relied on, among other things, the CAT scan of the plaintiff's lumbo-sacral spine conducted on November 4, 1998, a subsequent CAT scan in March, 1999, and a physical examination in August, 1999. (R. 36.) It is clear from Dr. De Feo's report and his conclusion that he was evaluating the plaintiff's prior conditions and symptoms. These were the identical medical conditions that the plaintiff relied upon in his application for DIB and SSI benefits. The fact that the plaintiff's conditions had substantially deteriorated from the time of the ALJ's determination is not a reasonable basis to conclude that the plaintiff had suffered a new disability or that the conditions had only become disabling after September 30, 1998. Rather, this evidence, which the Commissioner does not dispute was "new" provided substantial support for Dr. Inagami's earlier conclusions about the existence and the severity of the plaintiff's impairments.

In light of the entire record, including the supplemental submissions, it cannot be said that substantial evidence supported the Commissioner's determination that as of September 30, 1998 the plaintiff was not disabled. The Commissioner had found that despite the plaintiff's admittedly severe impairments, he had the residual functional capacity to perform his past relevant work as a leather cutter. Given the undisputed severe impairments, substantial evidence does not support the Commis-

sioner's conclusion. The Commissioner's conclusion is reversed because it is not supported by substantial evidence. The case should be remanded for a full development of the evidentiary record in accordance with the proper legal standards.

## CONCLUSION

For the reasons explained above, the plaintiff's motion for judgment on the pleadings is granted. The Commissioner's determination is reversed and the case is remanded pursuant to sentence four of 42 U.S.C. § 405(g). The Commissioner's cross-motion for judgment on the pleadings is denied. The case is remanded to the Commissioner for further administrative proceedings consistent with this Opinion and Order. The Clerk is directed to enter Judgment and to close this case.

**SO ORDERED.**